**AMERICAN CIVIL LIBERTIES UNION, et al.,**

v.

**Janet RENO, Attorney General of the United States.**

**AMERICAN LIBRARY ASSOCIATION, INC., et al.,**

v.

**UNITED STATES DEP'T OF JUSTICE, et al.**

Civil Action Nos. 96–963, 96–1458.

United States District Court, E.D. Pennsylvania.

June 11, 1996.

Christopher A. Hansen, Marjorie Heins, Ann Beeson, Steven R. Shapiro, Catherine Weiss, Laura Abel, American Civil Liberties Union Foundation, New York City; Stefan Presser, ACLU of Pennsylvania, Philadelphia, PA; David L. Sobel, Marc Rotenberg, Electronic Privacy Information Center, Washington, DC; Mike Godwin, Electronic Frontier Foundation, San Francisco, CA; Roger Evans, Planned Parenthood Foundation of America, New York City, for plaintiffs: American Civil Liberties Union, Human Rights Watch, Electronic Privacy Information Center, Electronic Frontier Foundation, Journalism Education Association, Computer Professionals for Social Responsibility, National Writers Union, ClariNet Communications Corp., Institute for Global Communications, Stop Prisoner Rape, Inc., AIDS Education Global Information System, Bibliobytes, Queer Resources Directory, Critical Path AIDS Project, Inc., Wildcat Press, Inc., Declan McCullagh, Brock Meeks, John Troyer, Jonathan Wallace, and Planned Parenthood Federation of America, Inc.

Bruce J. Ennis, Jr., Ann M. Kappler, John B. Morris, Jr., Jenner & Block, Washington, DC, Ronald P. Schiller, Piper & Marbury,

Philadelphia, PA, for plaintiffs: American Library Association, Inc., America Online, Inc., American Booksellers Association, Inc., American Booksellers Foundation for Free Expression, American Society of Newspaper Editors, Apple Computer, Inc., Association of American Publishers, Inc., Association of Publishers, Editors and Writers, Citizens Internet Empowerment Coalition, Commercial Internet Exchange Association, CompuServe Incorporated, Families Against Internet Censorship, Freedom to Read Foundation, Inc., Health Sciences Libraries Consortium, Hotwired Ventures LLC, Interactive Digital Software Association, Interactive Services Association, Magazine Publishers of America, Microsoft Corporation, The Microsoft Network, LLC, National Press Photographers Association, Netcom On–Line Communications Services, Inc., Newspaper Association of America, Opnet, Inc., Prodigy Services Company, Society of Professional Journalists, and Wired Ventures, Ltd.

Anthony J. Coppolino, Jason R. Baron, Patricia M. Russotto, Mary E. Kostel, Craig Blackwell, Theodore C. Hirt, U.S. Department of Justice, Civil Division, Washington, DC; Mark R. Kmetz, U.S. Attorney's Office, Philadelphia, PA (Frank M. Hunger, Asst. Attorney General, U.S. Department of Justice, Civil Division; Michael R. Stiles, U.S. Attorney, Philadelphia, PA; Dennis G. Linder, Lucinda Love, U.S. Department of Justice, Civil Division, on briefs), for defendants Janet Reno and Department of Justice.

James D. Crawford, Carl A. Solano, Jennifer DuFault James, Theresa E. Loscalzo, Joseph T. Lukens, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, for amici curiae Authors Guild, American Society of Journalists and Authors, Ed Carp, Coalition for Positive Sexuality, CONNECTnet, Creative on AOL, Tri Dang Do, Feminists for Free Expression, Margarita La Cabe, Maggie La Noue, LoD Communications, Peter Ludlow, Palmer Museum of Art, Chuck More, Rod Morgan, Pen American Center, Philadelphia Magazine, PSINet, Inc., Eric S. Raymond, Reporters Committee for Freedom of the Press, Don Rittner, The Sexuality Information & Education Council of the United States, Lloyd K. Stires, Peter J. Swanson, Kristi Thomas, Web Communications, and Miryam Ehrlic Williamson.

Cathleen A. Cleaver, Director of Legal Studies, Family Research Council, Washington, DC, Bruce A. Taylor, National Law Center for Children And Families, Fairfax, VA, for amici curiae The National Law Center for Children and Families, Family Research Council, "Enough is Enough" Campaign, National Coalition for the Protection of Children & Families, Morality in Media.

L. Theodore Hoppe, Jr., Black & Associates, P.C., Media, PA, Jay Alan Sekulow, Colby M. May, James M. Henderson, Sr., American Center for Law & Justice, Washington, DC, for amicus curiae the Family Life Project of the American Center for Law and Justice.

Andre L. Dennis, Stradley, Ronon, Stevens & Young, Philadelphia, PA, for amici curiae The Laboratory for Computer Science of the Massachusetts Institute of Technology and Michael L. Dertouzos, Director.

Before SLOVITER, Chief Circuit Judge, and BUCKWALTER and DALZELL, District Judges.

## ADJUDICATION ON MOTIONS FOR PRELIMINARY INJUNCTION

### I.

### *INTRODUCTION*

#### *Procedural Background*

Before us are motions for a preliminary injunction filed by plaintiffs who challenge on constitutional grounds provisions of the Communications Decency Act of 1996 (CDA or "the Act"), which constitutes Title V of the

Telecommunications Act of 1996, signed into law by the President on February 8, 1996.[1] Telecommunications Act of 1996, Pub.L. No. 104–104, § 502, 110 Stat. 56, 133–35. Plaintiffs include various organizations and individuals who, *inter alia,* are associated with the computer and/or communications industries, or who publish or post materials on the Internet, or belong to various citizen groups. *See* ACLU Complaint (¶¶ 7–26), ALA First Amended Complaint (¶¶ 3, 12–33).

The defendants in these actions are Janet Reno, the Attorney General of the United States, and the United States Department of Justice. For convenience, we will refer to these defendants as the Government. Plaintiffs contend that the two challenged provisions of the CDA that are directed to communications over the Internet which might be deemed "indecent" or "patently offensive" for minors, defined as persons under the age of eighteen, infringe upon rights protected by the First Amendment and the Due Process Clause of the Fifth Amendment.

Plaintiffs in Civil Action Number 96–963, in which the lead plaintiff is the American Civil Liberties Union (the ACLU),[2] filed their action in the United States District Court for the Eastern District of Pennsylvania on the day the Act was signed, and moved for a temporary restraining order to enjoin enforcement of these two provisions of the CDA. On February 15, 1996, following an evidentiary hearing, Judge Ronald L. Buckwalter, to whom the case had been assigned, granted a limited temporary restraining order, finding in a Memorandum that 47 U.S.C. § 223(a)(1)(B) ("the indecency provision" of the CDA) was unconstitutionally

vague. On the same day, Chief Judge Dolores K. Sloviter, Chief Judge of the United States Court of Appeals for the Third Circuit, having been requested by the parties and the district court to convene a three-judge court, pursuant to § 561(a) of the CDA, appointed such a court consisting of, in addition to Judge Buckwalter, Judge Stewart Dalzell of the same district, and herself, as the circuit judge required by 28 U.S.C. § 2284.

After a conference with the court, the parties entered into a stipulation, which the court approved on February 26, 1996, wherein the Attorney General agreed that:

she will not initiate any investigations or prosecutions for violations of 47 U.S.C. § 223(d) for conduct occurring after enactment of this provision until the three-judge court hears Plaintiffs' Motion for Preliminary Injunction ... and has decided the motion.

The Attorney General's commitment was qualified to the extent that she retained:

her full authority to investigate or prosecute any violation of § 223(a)(1)(B), *as amended,* and § 223(d) as to conduct which occurs or occurred during any period of time after enactment of these provisions (including for the period of time to which this stipulation applies) should the Court deny plaintiffs' motion or, if the motion is granted, should these provisions ultimately be upheld.

Stipulation, ¶ 4, in C.A. No. 96–963.

Shortly thereafter, the American Library Association, Inc. (the ALA) and others [3] filed

---

1. The CDA will be codified at 47 U.S.C. § 223(a) to (h). In the body of this Adjudication, we refer to the provisions of the CDA as they will ultimately be codified in the *United States Code.*

2. The plaintiffs in this action are the American Civil Liberties Union; Human Rights Watch; Electronic Privacy Information Center; Electronic Frontier Foundation; Journalism Education Association; Computer Professionals for Social Responsibility; National Writers Union; Clarinet Communications Corp.; Institute for Global Communications; Stop Prisoner Rape; AIDS Education Global Information System; Bibliobytes; Queer Resources Directory; Critical Path AIDS Project, Inc.; Wildcat Press, Inc.; Declan McCullagh dba Justice on Campus;

Brock Meeks dba Cyberwire Dispatch; John Troyer dba The Safer Sex Page; Jonathan Wallace dba The Ethical Spectacle; and Planned Parenthood Federation of America, Inc. We refer to these plaintiffs collectively as the ACLU.

3. The plaintiffs in the second action, in addition to the ALA, are: America Online, Inc.; American Booksellers Association, Inc.; American Booksellers Foundation for Free Expression; American Society of Newspaper Editors; Apple Computer, Inc.; Association of American Publishers, Inc.; Association of Publishers, Editors and Writers; Citizens Internet Empowerment Coalition; Commercial Internet Exchange Association; CompuServe Incorporated; Families Against Internet

a similar action at C.A. No. 96–1458. On February 27, 1996, Chief Judge Sloviter, again pursuant to § 561(a) of the CDA and upon request, convened the same three-judge court pursuant to 28 U.S.C. § 2284. The actions were consolidated pursuant to Fed. R.Civ.P. 42(a), "for all matters relating to the disposition of motions for preliminary injunction in these cases, including the hearing on such motions."

The parties were afforded expedited discovery in connection with the motions for preliminary injunction, and they cooperated with Judge Dalzell, who had been assigned the case management aspects of the litigation. While the discovery was proceeding, and with the agreement of the parties, the court began receiving evidence at the consolidated hearings which were conducted on March 21 and 22, and April 1, 12 and 15, 1996. In order to expedite the proceedings,

the parties worked closely with Judge Dalzell and arranged to stipulate to many of the underlying facts and to place much of their cases in chief before the court by sworn declarations, so that the hearings were largely devoted to cross-examination of certain of the witnesses whose declarations had been filed. The parties submitted proposed findings of fact and post-hearing memoranda on April 29, and the court heard extensive oral argument on May 10, 1996.[4]

### Statutory Provisions at Issue

Plaintiffs focus their challenge on two provisions of section 502 of the CDA which amend 47 U.S.C. §§ 223(a) and 223(d).

■ Section 223(a)(1)(B) provides in part that any person in interstate or foreign communications who, "by means of a telecommunications device,"[5] "knowingly ... makes,

Censorship; Freedom to Read Foundation, Inc.; Health Sciences Libraries Consortium; Hotwired Ventures LLC; Interactive Digital Software Association; Interactive Services Association; Magazine Publishers of America; Microsoft Corporation; The Microsoft Network, L.L.C.; National Press Photographers Association; Netcom On-Line Communication Services, Inc.; Newspaper Association of America; Opnet, Inc.; Prodigy Services Company; Society of Professional Journalists; Wired Ventures, Ltd. We refer to these plaintiffs collectively as the ALA.

The eight counts of the amended complaint in this action focus on the CDA's amendment to 47 U.S.C. § 223, and do not challenge the CDA's amendment of 18 U.S.C. § 1462(c).

**4.** In addition, we have received briefs of *amici curiae* supporting and opposing plaintiffs' contentions. Arguing in favor of our granting the motions for preliminary injunction are Authors Guild, American Society of Journalists and Authors, Ed Carp, Coalition for Positive Sexuality, CONNECTnet, Creative Coalition on AOL, Tri Dang Do, Feminists for Free Expression, Margarita Lacabe, Maggie LaNoue, LoD Communications, Peter Ludlow, Palmer Museum of Art, Chuck More, Rod Morgan, PEN American Center, Philadelphia Magazine, PSINet, Inc., Eric S. Raymond, Reporters Committee for Freedom of the Press, Don Rittner, The Sexuality Information and Education Council of the United States, Lloyd K. Stires, Peter J. Swanson, Kirsti Thomas, Web Communications, and Miryam Ehrlich Williamson. Opposing the motion are the Family Life Project of the American Center for Law and Justice and a group consisting of The National Law Center for Children and Families, Family Research Council, "Enough Is Enough!" Cam-

paign, National Coalition for the Protection of Children and Families, and Morality in Media.

**5.** The Act does not define "telecommunications device". By Order dated February 27, 1996, we asked the parties to address whether a modem is a "telecommunications device". Plaintiffs and the Government answered in the affirmative, and we agree that the plain meaning of the phrase and the legislative history of the Act strongly support their conclusion. "Telecommunications" under 47 U.S.C. § 153(48) means "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form of content of the information as sent and received." The plain meaning of "device" is "something that is formed or formulated by design and usu[ally] with consideration of possible alternatives, experiment, and testing." *Webster's Third New International Dictionary*, 618 (1986). Clearly, the sponsors of the CDA thought it would reach individual Internet users, many of whom still connect through modems. *See, e.g.*, 141 Cong. Rec. S8329–46 (daily ed. June 14, 1995) (statements of Sen. Exon and Sen. Coats).

The resolution of the tension between the scope of "telecommunications device" and the scope of "interactive computer service" as defined in 47 U.S.C. § 230(a)(2), *see infra* note 6, must await another day. It is sufficient for us to conclude that the exclusion of § 223(h)(1)(B) is probably a narrow one (as the Government has argued), insulating an interactive computer service from criminal liability under the CDA but not insulating users who traffic in indecent and patently offensive materials on the Internet through those services.

creates, or solicits" and "initiates the transmission" of "any comment, request, suggestion, proposal, image or other communication which is obscene or *indecent,* knowing that the recipient of the communication is under 18 years of age," "shall be criminally fined or imprisoned." (emphasis added).

Section 223(d)(1) ("the patently offensive provision"), makes it a crime to use an "interactive computer service"[6] to "send" or "display in a manner available" to a person under age 18, "any comment, request, suggestion, proposal, image, or other communication that, in context, depicts or describes, in terms patently offensive as measured by contemporary community standards, sexual or excretory activities or organs, regardless of whether the user of such service placed the call or initiated the communication."

Plaintiffs also challenge on the same grounds the provisions in § 223(a)(2) and § 223(d)(2), which make it a crime for anyone to "knowingly permit[ ] any telecommunications facility under [his or her] control to be used for any activity prohibited" in §§ 223(a)(1)(B) and 223(d)(1). The challenged provisions impose a punishment of a fine, up to two years imprisonment, or both for each offense.

Plaintiffs make clear that they do not quarrel with the statute to the extent that it covers obscenity or child pornography, which were already proscribed before the CDA's adoption. *See* 18 U.S.C. §§ 1464–65 (criminalizing obscene material); *id.* §§ 2251–52 (criminalizing child pornography); *see also New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982); *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).

Plaintiffs in the ACLU action also challenge the provision of the CDA that criminalizes speech over the Internet that transmits information about abortions or abortifacient drugs and devices, through its amendment of 18 U.S.C. § 1462(c). That section now prohibits the sending and receiving of information over the Internet by any means regarding "where, how, or of whom, or by what means any [drug, medicine, article, or thing designed, adapted, or intended for producing abortion] may be obtained or made". The Government has stated that it does not contest plaintiffs' challenge to the enforceability of the provision of the CDA as it relates to 18 U.S.C. § 1462(c).[7]

As part of its argument that the CDA passes constitutional muster, the Government cites the CDA's "safe harbor" defenses in new § 223(e) of 47 U.S.C., which provides:

(e) **Defenses**

In addition to any other defenses available by law:

(1) No person shall be held to have violated subsection (a) or (d) of this section solely for providing access or connection to or from a facility, system, or network not under that person's control, including transmission, downloading, intermediate storage, access software, or other related capabilities that are incidental to providing such access or connection that does not include the creation of the content of the communication.

(2) The defenses provided by paragraph (1) of this subsection shall not be applicable to a person who is a conspirator with an entity actively involved in the creation

---

**6.** The statute at § 509 amends 47 U.S.C. to add § 230(e)(2), which defines such a service as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions."

**7.** In the Government's Opposition to plaintiffs' motion for a temporary restraining order in C.A. No. 96–963, it notes "the Department has a longstanding policy that previous such provisions are unconstitutional and will not be enforced", and

that both President Clinton and Attorney General Reno "have made th[e] point clear" that no one will be prosecuted under "the abortion-related provision of newly-amended 18 U.S.C. § 1462(c)." Opposition at 19, n. 11 (February 14, 1996). In view of this "longstanding policy", the Government contends there is no realistic fear of prosecution and, so the argument goes, no need for equitable relief. *Id.* In their post-hearing brief, the ACLU plaintiffs inform us that in view of the Government's statement, "they do not seek a preliminary injunction against the enforcement of § 1462(c)." Post–Trial Brief of ACLU Plaintiffs at 2 n. 2.

or knowing distribution of communications that violate this section, or who knowingly advertises the availability of such communications.

(3) The defenses provided in paragraph (1) of this subsection shall not be applicable to a person who provides access or connection to a facility, system, or network engaged in the violation of this section that is owned or controlled by such person.

(4) No employer shall be held liable under this section for the actions of an employee or agent unless the employee's or agent's conduct is within the scope of his or her employment or agency and the employer (A) having knowledge of such conduct, authorizes or ratifies such conduct, or (B) recklessly disregards such conduct.

(5) It is a defense to a prosecution under subsection (a)(1)(B) or (d) of this section, or under subsection (a)(2) of this section with respect to the use of a facility for an activity under subsection (a)(1)(B) that a person—

(A) has taken, in good faith, reasonable, effective, and appropriate actions under the circumstances to restrict or prevent access by minors to a communication specified in such subsections, which may involve any appropriate measures to restrict minors from such communications, including any method which is feasible under available technology; or

(B) has restricted access to such communication by requiring use of a verified credit card, debit account, adult access code, or adult personal identification number.

(6) The [Federal Communications] Commission may describe measures which are reasonable, effective, and appropriate to restrict access to prohibited communications under subsection (d) of this section.

Nothing in this section authorizes the Commission to enforce, or is intended to provide the Commission with the authority to approve, sanction, or permit, the use of such measures. The Commission shall have no enforcement authority over the failure to utilize such measures. . . .

## II.

## *FINDINGS OF FACT*

All parties agree that in order to apprehend the legal questions at issue in these cases, it is necessary to have a clear understanding of the exponentially growing, worldwide medium that is the Internet, which presents unique issues relating to the application of First Amendment jurisprudence and due process requirements to this new and evolving method of communication. For this reason all parties insisted on having extensive evidentiary hearings before the three-judge court. The court's Findings of fact are made pursuant to Fed.R.Civ.P. 52(a). The history and basic technology of this medium are not in dispute, and the first forty-eight paragraphs of the following Findings of fact are derived from the like-numbered paragraphs of a stipulation [8] the parties filed with the court.[9]

### *The Nature of Cyberspace*

### The Creation of the Internet and the Development of Cyberspace

1. The Internet is not a physical or tangible entity, but rather a giant network which interconnects innumerable smaller groups of linked computer networks. It is thus a network of networks. This is best understood if one considers what a linked group of computers—referred to here as a "network"—is, and what it does. Small networks are now ubiquitous (and are often called "local area

---

8. The court again expresses its appreciation to the parties for their cooperative attitude in evolving the stipulation.

9. The Government has not by motion challenged the standing of any plaintiff in either case, and we harbor no doubts of our own on that point, notwithstanding the Government's suggestion in a footnote of its post-hearing brief. *See* Defendants' Post–Hearing Memorandum at 37 n. 46 ("Plaintiffs' assertions as to the speech at issue are so off-point as to raise standing concerns."). Descriptions of these plaintiffs, as well as of the nature and content of the speech they contend is or may be affected by the CDA, are set forth in paragraphs 70 through 356 at pages 30 through 103 of the parties' stipulation filed in these actions. These paragraphs will not be reproduced here, but will be deemed adopted as Findings of the court.

networks"). For example, in many United States Courthouses, computers are linked to each other for the purpose of exchanging files and messages (and to share equipment such as printers). These are networks.

2. Some networks are "closed" networks, not linked to other computers or networks. Many networks, however, are connected to other networks, which are in turn connected to other networks in a manner which permits each computer in any network to communicate with computers on any other network in the system. This global Web of linked networks and computers is referred to as the Internet.

3. The nature of the Internet is such that it is very difficult, if not impossible, to determine its size at a given moment. It is indisputable, however, that the Internet has experienced extraordinary growth in recent years. In 1981, fewer than 300 computers were linked to the Internet, and by 1989, the number stood at fewer than 90,000 computers. By 1993, over 1,000,000 computers were linked. Today, over 9,400,000 host computers worldwide, of which approximately 60 percent located within the United States, are estimated to be linked to the Internet. This count does *not* include the personal computers people use to access the Internet using modems. In all, reasonable estimates are that as many as 40 million people around the world can and do access the enormously flexible communication Internet medium. That figure is expected to grow to 200 million Internet users by the year 1999.

4. Some of the computers and computer networks that make up the Internet are owned by governmental and public institutions, some are owned by non-profit organizations, and some are privately owned. The resulting whole is a decentralized, global medium of communications—or "cyberspace"—that links people, institutions, corporations, and governments around the world. The Internet is an international system. This communications medium allows any of the literally tens of millions of people with access to the Internet to exchange information. These communications can occur almost instantaneously, and can be directed either to specific individuals, to a broader group of people interested in a particular subject, or to the world as a whole.

5. The Internet had its origins in 1969 as an experimental project of the Advanced Research Project Agency ("ARPA"), and was called ARPANET. This network linked computers and computer networks owned by the military, defense contractors, and university laboratories conducting defense-related research. The network later allowed researchers across the country to access directly and to use extremely powerful supercomputers located at a few key universities and laboratories. As it evolved far beyond its research origins in the United States to encompass universities, corporations, and people around the world, the ARPANET came to be called the "DARPA Internet," and finally just the "Internet."

6. From its inception, the network was designed to be a decentralized, self-maintaining series of redundant links between computers and computer networks, capable of rapidly transmitting communications without direct human involvement or control, and with the automatic ability to re-route communications if one or more individual links were damaged or otherwise unavailable. Among other goals, this redundant system of linked computers was designed to allow vital research and communications to continue even if portions of the network were damaged, say, in a war.

7. To achieve this resilient nationwide (and ultimately global) communications medium, the ARPANET encouraged the creation of multiple links to and from each computer (or computer network) on the network. Thus, a computer located in Washington, D.C., might be linked (usually using dedicated telephone lines) to other computers in neighboring states or on the Eastern seaboard. Each of those computers could in turn be linked to other computers, which themselves would be linked to other computers.

8. A communication sent over this redundant series of linked computers could travel any of a number of routes to its destination. Thus, a message sent from a computer in Washington, D.C., to a computer in Palo

Alto, California, might first be sent to a computer in Philadelphia, and then be forwarded to a computer in Pittsburgh, and then to Chicago, Denver, and Salt Lake City, before finally reaching Palo Alto. If the message could not travel along that path (because of military attack, simple technical malfunction, or other reason), the message would automatically (without human intervention or even knowledge) be re-routed, perhaps, from Washington, D.C. to Richmond, and then to Atlanta, New Orleans, Dallas, Albuquerque, Los Angeles, and finally to Palo Alto. This type of transmission, and re-routing, would likely occur in a matter of seconds.

9. Messages between computers on the Internet do not necessarily travel entirely along the same path. The Internet uses "packet switching" communication protocols that allow individual messages to be subdivided into smaller "packets" that are then sent independently to the destination, and are then automatically reassembled by the receiving computer. While all packets of a given message often travel along the same path to the destination, if computers along the route become overloaded, then packets can be re-routed to less loaded computers.

10. At the same time that ARPANET was maturing (it subsequently ceased to exist), similar networks developed to link universities, research facilities, businesses, and individuals around the world. These other formal or loose networks included BITNET, CSNET, FIDONET, and USENET. Eventually, each of these networks (many of which overlapped) were themselves linked together, allowing users of any computers linked to any one of the networks to transmit communications to users of computers on other networks. It is this series of linked networks (themselves linking computers and computer networks) that is today commonly known as the Internet.

11. No single entity—academic, corporate, governmental, or non-profit—administers the Internet. It exists and functions as a result of the fact that hundreds of thousands of separate operators of computers and computer networks independently decided to use common data transfer protocols to exchange communications and information with other computers (which in turn exchange communications and information with still other computers). There is no centralized storage location, control point, or communications channel for the Internet, and it would not be technically feasible for a single entity to control all of the information conveyed on the Internet.

### How Individuals Access the Internet

12. Individuals have a wide variety of avenues to access cyberspace in general, and the Internet in particular. In terms of physical access, there are two common methods to establish an actual link to the Internet. First, one can use a computer or computer terminal that is directly (and usually permanently) connected to a computer network that is itself directly or indirectly connected to the Internet. Second, one can use a "personal computer" with a "modem" to connect over a telephone line to a larger computer or computer network that is itself directly or indirectly connected to the Internet. As detailed below, both direct and modem connections are made available to people by a wide variety of academic, governmental, or commercial entities.

13. Students, faculty, researchers, and others affiliated with the vast majority of colleges and universities in the United States can access the Internet through their educational institutions. Such access is often via direct connection using computers located in campus libraries, offices, or computer centers, or may be through telephone access using a modem from a student's or professor's campus or off-campus location. Some colleges and universities install "ports" or outlets for direct network connections in each dormitory room or provide access via computers located in common areas in dormitories. Such access enables students and professors to use information and content provided by the college or university itself, and to use the vast amount of research resources and other information available on the Internet worldwide.

14. Similarly, Internet resources and access are sufficiently important to many corporations and other employers that those employers link their office computer net-

works to the Internet and provide employees with direct or modem access to the office network (and thus to the Internet). Such access might be used by, for example, a corporation involved in scientific or medical research or manufacturing to enable corporate employees to exchange information and ideas with academic researchers in their fields.

15. Those who lack access to the Internet through their schools or employers still have a variety of ways they can access the Internet. Many communities across the country have established "free-nets" or community networks to provide their citizens with a local link to the Internet (and to provide local-oriented content and discussion groups). The first such community network, the Cleveland Free–Net Community Computer System, was established in 1986, and free-nets now exist in scores of communities as diverse as Richmond, Virginia, Tallahassee, Florida, Seattle, Washington, and San Diego, California. Individuals typically can access free-nets at little or no cost via modem connection or by using computers available in community buildings. Free-nets are often operated by a local library, educational institution, or non-profit community group.

16. Individuals can also access the Internet through many local libraries. Libraries often offer patrons use of computers that are linked to the Internet. In addition, some libraries offer telephone modem access to the libraries' computers, which are themselves connected to the Internet. Increasingly, patrons now use library services and resources without ever physically entering the library itself. Libraries typically provide such direct or modem access at no cost to the individual user.

17. Individuals can also access the Internet by patronizing an increasing number of storefront "computer coffee shops," where customers—while they drink their coffee—can use computers provided by the shop to access the Internet. Such Internet access is typically provided by the shop for a small hourly fee.

18. Individuals can also access the Internet through commercial and non-commercial "Internet service providers" that typically offer modem telephone access to a computer or computer network linked to the Internet. Many such providers—including the members of plaintiff Commercial Internet Exchange Association—are commercial entities offering Internet access for a monthly or hourly fee. Some Internet service providers, however, are non-profit organizations that offer free or very low cost access to the Internet. For example, the International Internet Association offers free modem access to the Internet upon request. Also, a number of trade or other non-profit associations offer Internet access as a service to members.

19. Another common way for individuals to access the Internet is through one of the major national commercial "online services" such as America Online, CompuServe, the Microsoft Network, or Prodigy. These online services offer nationwide computer networks (so that subscribers can dial-in to a local telephone number), and the services provide extensive and well organized content within their own proprietary computer networks. In addition to allowing access to the extensive content available *within* each online service, the services also allow subscribers to link to the much larger resources of the Internet. Full access to the online service (including access to the Internet) can be obtained for modest monthly or hourly fees. The major commercial online services have almost twelve million individual subscribers across the United States.

20. In addition to using the national commercial online services, individuals can also access the Internet using some (but not all) of the thousands of local dial-in computer services, often called "bulletin board systems" or "BBSs." With an investment of as little as $2,000.00 and the cost of a telephone line, individuals, non-profit organizations, advocacy groups, and businesses can offer their own dial-in computer "bulletin board" service where friends, members, subscribers, or customers can exchange ideas and information. BBSs range from single computers with only one telephone line into the computer (allowing only one user at a time), to single computers with many telephone lines into the computer (allowing multiple simultaneous

users), to multiple linked computers each servicing multiple dial-in telephone lines (allowing multiple simultaneous users). Some (but not all) of these BBS systems offer direct or indirect links to the Internet. Some BBS systems charge users a nominal fee for access, while many others are free to the individual users.

21. Although commercial access to the Internet is growing rapidly, many users of the Internet—such as college students and staff—do not individually pay for access (except to the extent, for example, that the cost of computer services is a component of college tuition). These and other Internet users can access the Internet without paying for such access with a credit card or other form of payment.

## Methods to Communicate Over the Internet

22. Once one has access to the Internet, there are a wide variety of different methods of communication and information exchange over the network. These many methods of communication and information retrieval are constantly evolving and are therefore difficult to categorize concisely. The most common methods of communications on the Internet (as well as within the major online services) can be roughly grouped into six categories:

(1) one-to-one messaging (such as "e-mail"),

(2) one-to-many messaging (such as "listserv"),

(3) distributed message databases (such as "USENET newsgroups"),

(4) real time communication (such as "Internet Relay Chat"),

(5) real time remote computer utilization (such as "telnet"), and

(6) remote information retrieval (such as "ftp," "gopher," and the "World Wide Web").

Most of these methods of communication can be used to transmit text, data, computer programs, sound, visual images (*i.e.*, pictures), and moving video images.

23. *One-to-one messaging.* One method of communication on the Internet is via electronic mail, or "e-mail," comparable in princi-

ple to sending a first class letter. One can address and transmit a message to one or more other people. E-mail on the Internet is not routed through a central control point, and can take many and varying paths to the recipients. Unlike postal mail, simple e-mail generally is not "sealed" or secure, and can be accessed or viewed on intermediate computers between the sender and recipient (unless the message is encrypted).

24. *One-to-many messaging.* The Internet also contains automatic mailing list services (such as "listservs"), [also referred to by witnesses as "mail exploders"] that allow communications about particular subjects of interest to a group of people. For example, people can subscribe to a "listserv" mailing list on a particular topic of interest to them. The subscriber can submit messages on the topic to the listserv that are forwarded (via e-mail), either automatically or through a human moderator overseeing the listserv, to anyone who has subscribed to the mailing list. A recipient of such a message can reply to the message and have the reply also distributed to everyone on the mailing list. This service provides the capability to keep abreast of developments or events in a particular subject area. Most listserv-type mailing lists automatically forward all incoming messages to all mailing list subscribers. There are thousands of such mailing list services on the Internet, collectively with hundreds of thousands of subscribers. Users of "open" listservs typically can add or remove their names from the mailing list automatically, with no direct human involvement. Listservs may also be "closed," *i.e.*, only allowing for one's acceptance into the listserv by a human moderator.

25. *Distributed message databases.* Similar in function to listservs—but quite different in how communications are transmitted—are distributed message databases such as "USENET newsgroups." User-sponsored newsgroups are among the most popular and widespread applications of Internet services, and cover all imaginable topics of interest to users. Like listservs, newsgroups are open discussions and exchanges on particular topics. Users, however, need not subscribe to the discussion mailing list in advance, but can

instead access the database at any time. Some USENET newsgroups are "moderated" but most are open access. For the moderated newsgroups,[10] all messages to the newsgroup are forwarded to one person who can screen them for relevance to the topics under discussion. USENET newsgroups are disseminated using ad hoc, peer to peer connections between approximately 200,000 computers (called USENET "servers") around the world. For unmoderated newsgroups, when an individual user with access to a USENET server posts a message to a newsgroup, the message is automatically forwarded to all adjacent USENET servers that furnish access to the newsgroup, and it is then propagated to the servers adjacent to those servers, etc. The messages are temporarily stored on each receiving server, where they are available for review and response by individual users. The messages are automatically and periodically purged from each system after a time to make room for new messages. Responses to messages, like the original messages, are automatically distributed to all other computers receiving the newsgroup or forwarded to a moderator in the case of a moderated newsgroup. The dissemination of messages to USENET servers around the world is an automated process that does not require direct human intervention or review.

26. There are newsgroups on more than fifteen thousand different subjects. In 1994, approximately 70,000 messages were posted to newsgroups each day, and those messages were distributed to the approximately 190,000 computers or computer networks that participate in the USENET newsgroup system. Once the messages reach the approximately 190,000 receiving computers or computer networks, they are available to individual users of those computers or computer networks. Collectively, almost 100,000 new messages (or "articles") are posted to newsgroups each day.

27. *Real time communication.* In addition to transmitting messages that can be later read or accessed, individuals on the Internet can engage in an immediate dialog, in "real time", with other people on the Internet. In its simplest forms, "talk" allows one-to-one communications and "Internet Relay Chat" (or IRC) allows two or more to type messages to each other that almost immediately appear on the others' computer screens. IRC is analogous to a telephone party line, using a computer and keyboard rather than a telephone. With IRC, however, at any one time there are thousands of different party lines available, in which collectively tens of thousands of users are engaging in conversations on a huge range of subjects. Moreover, one can create a new party line to discuss a different topic at any time. Some IRC conversations are "moderated" or include "channel operators."

28. In addition, commercial online services such as America Online, CompuServe, the Microsoft Network, and Prodigy have their own "chat" systems allowing their members to converse.

29. *Real time remote computer utilization.* Another method to use information on the Internet is to access and control remote computers in "real time" using "telnet." For example, using telnet, a researcher at a university would be able to use the computing power of a supercomputer located at a different university. A student can use telnet to connect to a remote library to access the library's online card catalog program.

30. *Remote information retrieval.* The final major category of communication may be the most well known use of the Internet—the search for and retrieval of information located on remote computers. There are three primary methods to locate and retrieve information on the Internet.

31. A simple method uses "ftp" (or file transfer protocol) to list the names of computer files available on a remote computer, and to transfer one or more of those files to an individual's local computer.

32. Another approach uses a program and format named "gopher" to guide an indi-

---

**10.** It became clear from the testimony that moderated newsgroups are the exception and unmoderated newsgroups are the rule.

vidual's search through the resources available on a remote computer.

### The World Wide Web

33. A third approach, and fast becoming the most well-known on the Internet, is the "World Wide Web." The Web utilizes a "hypertext" formatting language called hypertext markup language (HTML), and programs that "browse" the Web can display HTML documents containing text, images, sound, animation and moving video. Any HTML document can include links to other types of information or resources, so that while viewing an HTML document that, for example, describes resources available on the Internet, one can "click" using a computer mouse on the description of the resource and be immediately connected to the resource itself. Such "hyperlinks" allow information to be accessed and organized in very flexible ways, and allow people to locate and efficiently view related information even if the information is stored on numerous computers all around the world.

34. *Purpose.* The World Wide Web (W3C) was created to serve as the platform for a global, online store of knowledge, containing information from a diversity of sources and accessible to Internet users around the world. Though information on the Web is contained in individual computers, the fact that each of these computers is connected to the Internet through W3C protocols allows all of the information to become part of a single body of knowledge. It is currently the most advanced information system developed on the Internet, and embraces within its data model most information in previous networked information systems such as ftp, gopher, wais, and Usenet.

35. *History.* W3C was originally developed at CERN, the European Particle Physics Laboratory, and was initially used to allow information sharing within internationally dispersed teams of researchers and engineers. Originally aimed at the High Energy Physics community, it has spread to other areas and attracted much interest in user support, resource recovery, and many other areas which depend on collaborative and information sharing. The Web has extended beyond the scientific and academic community to include communications by individuals, non-profit organizations, and businesses.

36. *Basic Operation.* The World Wide Web is a series of documents stored in different computers all over the Internet. Documents contain information stored in a variety of formats, including text, still images, sounds, and video. An essential element of the Web is that any document has an address (rather like a telephone number). Most Web documents contain "links." These are short sections of text or image which refer to another document. Typically the linked text is blue or underlined when displayed, and when selected by the user, the referenced document is automatically displayed, wherever in the world it actually is stored. Links for example are used to lead from overview documents to more detailed documents, from tables of contents to particular pages, but also as cross-references, footnotes, and new forms of information structure.

37. Many organizations now have "home pages" on the Web. These are documents which provide a set of links designed to represent the organization, and through links from the home page, guide the user directly or indirectly to information about or relevant to that organization.

38. As an example of the use of links, if these Findings were to be put on a World Wide Web site, its home page might contain links such as those:

* THE NATURE OF CYBERSPACE

* CREATION OF THE INTERNET AND THE DEVELOPMENT OF CYBERSPACE

* HOW PEOPLE ACCESS THE INTERNET

* METHODS TO COMMUNICATE OVER THE INTERNET

39. Each of these links takes the user of the site from the beginning of the Findings to the appropriate section within this Adjudication. Links may also take the user from the original Web site to another Web site on another computer connected to the Internet. These links from one computer to another, from one document to another across the

Internet, are what unify the Web into a single body of knowledge, and what makes the Web unique. The Web was designed with a maximum target time to follow a link of one tenth of a second.

40. *Publishing.* The World Wide Web exists fundamentally as a platform through which people and organizations can communicate through shared information. When information is made available, it is said to be "published" on the Web. Publishing on the Web simply requires that the "publisher" has a computer connected to the Internet and that the computer is running W3C server software. The computer can be as simple as a small personal computer costing less than $1500 dollars or as complex as a multi-million dollar mainframe computer. Many Web publishers choose instead to lease disk storage space from someone else who has the necessary computer facilities, eliminating the need for actually owning any equipment oneself.

41. The Web, as a universe of network accessible information, contains a variety of documents prepared with quite varying degrees of care, from the hastily typed idea, to the professionally executed corporate profile. The power of the Web stems from the ability of a link to point to any document, regardless of its status or physical location.

42. Information to be published on the Web must also be formatted according to the rules of the Web standards. These standardized formats assure that all Web users who want to read the material will be able to view it. Web standards are sophisticated and flexible enough that they have grown to meet the publishing needs of many large corporations, banks, brokerage houses, newspapers and magazines which now publish "online" editions of their material, as well as government agencies, and even courts, which use the Web to disseminate information to the public. At the same time, Web publishing is simple enough that thousands of individual users and small community organizations are using the Web to publish their own personal "home pages," the equivalent of individualized newsletters about that person or organization, which are available to everyone on the Web.

43. Web publishers have a choice to make their Web sites open to the general pool of all Internet users, or close them, thus making the information accessible only to those with advance authorization. Many publishers choose to keep their sites open to all in order to give their information the widest potential audience. In the event that the publishers choose to maintain restrictions on access, this may be accomplished by assigning specific user names and passwords as a prerequisite to access to the site. Or, in the case of Web sites maintained for internal use of one organization, access will only be allowed from other computers within that organization's local network.[11]

44. *Searching the Web.* A variety of systems have developed that allow users of the Web to search particular information among all of the public sites that are part of the Web. Services such as Yahoo, Magellan, Altavista, Webcrawler, and Lycos are all services known as "search engines" which allow users to search for Web sites that contain certain categories of information, or to search for key words. For example, a Web user looking for the text of Supreme Court opinions would type the words "Supreme Court" into a search engine, and then be presented with a list of World Wide Web sites that contain Supreme Court information. This list would actually be a series of links to those sites. Having searched out a number of sites that might contain the desired information, the user would then follow individual links, browsing through the information on each site, until the desired material is found. For many content providers on the Web, the ability to be found by these search engines is very important.

45. *Common standards.* The Web links together disparate information on an ever-growing number of Internet-linked computers by setting common information storage formats (HTML) and a common language for the exchange of Web documents (HTTP).

---

**11.** The evidence adduced at the hearings provided detail to this paragraph of the parties' stipulation. *See* Findings 95 to 107.

Although the information itself may be in many different formats, and stored on computers which are not otherwise compatible, the basic Web standards provide a basic set of standards which allow communication and exchange of information. Despite the fact that many types of computers are used on the Web, and the fact that many of these machines are otherwise incompatible, those who "publish" information on the Web are able to communicate with those who seek to access information with little difficulty because of these basic technical standards.

46. *A distributed system with no centralized control.* Running on tens of thousands of individual computers on the Internet, the Web is what is known as a distributed system. The Web was designed so that organizations with computers containing information can become part of the Web simply by attaching their computers to the Internet and running appropriate World Wide Web software. No single organization controls any membership in the Web, nor is there any single centralized point from which individual Web sites or services can be blocked from the Web. From a user's perspective, it may appear to be a single, integrated system, but in reality it has no centralized control point.

47. *Contrast to closed databases.* The Web's open, distributed, decentralized nature stands in sharp contrast to most information systems that have come before it. Private information services such as Westlaw, Lexis/Nexis, and Dialog, have contained large storehouses of knowledge, and can be accessed from the Internet with the appropriate passwords and access software. However, these databases are not linked together into a single whole, as is the World Wide Web.

48. *Success of the Web in research, education, and political activities.* The World Wide Web has become so popular because of its open, distributed, and·easy-to-use nature.

Rather than requiring those who seek information to purchase new software or hardware, and to learn a new kind of system for each new database of information they seek to access, the Web environment makes it easy for users to jump from one set of information to another. By the same token, the open nature of the Web makes it easy for publishers to reach their intended audiences without having to know in advance what kind of computer each potential reader has, and what kind of software they will be using.

## Restricting Access to Unwanted On–Line Material [12]

### PICS

49. With the rapid growth of the Internet, the increasing popularity of the Web, and the existence of material online that some parents may consider inappropriate for their children, various entities have begun to build systems intended to enable parents to control the material which comes into their homes and may be accessible to their children. The World Wide Web Consortium launched the PICS ("Platform for Internet Content Selection") program in order to develop technical standards that would support parents' ability to filter and screen material that their children see on the Web.

50. The Consortium intends that PICS will provide the ability for third parties, as well as individual content providers, to rate content on the Internet in a variety of ways. When fully implemented, PICS-compatible World Wide Web browsers, Usenet News Group readers, and other Internet applications, will provide parents the ability to choose from a variety of rating services, or a combination of services.

51. PICS working group [PICS–WG] participants include many of the major online services providers, commercial internet access providers, hardware and software companies, major internet content providers, and

---

**12.** Testimony adduced at the hearing suggests that market forces exist to limit the availability of material on-line that parents consider inappropriate for their children. Although the parties sharply dispute the efficacy of so-called "parental empowerment" software, there ·is a sufficiently wide zone of agreement on what is available to restrict access to unwanted sites that the parties were able to enter into twenty-one paragraphs of stipulated facts on the subject, which form the basis of paragraphs 49 through 69 of our Findings of fact. Because of the rapidity of developments in this field, some of the technological facts we have found may become partially obsolete by the time of publication of these Findings.

consumer organizations. Among active participants in the PICS effort are:

Adobe Systems, Inc.

Apple Computer

America Online

AT & T

Center for Democracy and Technology

CompuServe

Delphi Internet Services

Digital Equipment Corporation

IBM

First floor

First Virtual Holdings Incorporated

France Telecom

FTP Software

Industrial Technology Research Institute of Taiwan

Information Technology Association of America

Institut National de Recherche en Informatique et en Automatique (INRIA)

Interactive Services Association

MCI

Microsoft

MIT/LCS/World Wide Web Consortium

NCD

NEC

Netscape Communications Corporation

NewView

O'Reilly and Associates

Open Market

Prodigy Services Company

Progressive Networks

Providence Systems/Parental Guidance

Recreational Software Advisory Council

SafeSurf

SoftQuad, Inc.

Songline Studios

Spyglass

SurfWatch Software

Telequip Corp.

Time Warner Pathfinder

Viacom Nickelodeon [13]

52. Membership in the PICS–WG includes a broad cross-section of companies from the computer, communications, and content industries, as well as trade associations and public interest groups. PICS technical specifications have been agreed to, allowing the Internet community to begin to deploy products and services based on the PICS-standards.

53. Until a majority of sites on the Internet have been rated by a PICS rating service, PICS will initially function as a "positive" ratings system in which only those sites that have been rated will be displayed using PICS compatible software. In other words, PICS will initially function as a site *inclusion* list rather than a site *exclusion* list. The default configuration for a PICS compatible Internet application will be to block access to all sites which have not been rated by a PICS rating service, while allowing access to sites which have a PICS rating for appropriate content.[14]

**Software**

54. For over a year, various companies have marketed stand alone software that is intended to enable parents and other adults to limit the Internet access of children. Examples of such software include: Cyber Patrol, CYBERsitter, The Internet Filter, Net Nanny, Parental Guidance, SurfWatch, Netscape Proxy Server, and WebTrack. The market for this type of software is growing, and there is increasing competition among software providers to provide products.

**Cyber Patrol**

55. As more people, particularly children, began to use the Internet, Microsystems Software, Inc. decided to develop and market Internet software intended to empower parents to exercise individual choice over what material their children could access. Microsystems' stated intent is to develop a product which would give parents comfort that their children can reap the benefits of the Internet while shielding them from objectionable or

---

**13.** This membership is constantly growing, according to the testimony of Albert Vezza, Chairman of the World Wide Web Consortium. *See also* Defendants' Ex. D–167.

**14.** *See also* Defendants' Ex. D–174 and the testimony of Mr. Vezza.

otherwise inappropriate materials based on the parents' own particular tastes and values. Microsystems' product, Cyber Patrol, was developed to address this need.

56. Cyber Patrol was first introduced in August 1995, and is currently available in Windows and Macintosh versions. Cyber Patrol works with both direct Internet Access providers (ISPs, e.g., Netcom, PSI, UUnet), and Commercial Online Service Providers (e.g., America Online, CompuServ, Prodigy, Microsoft). Cyber Patrol is also compatible with all major World Wide Web browsers on the market (e.g., Netscape, Navigator, Mosaic, Prodigy's Legacy and Skimmer browsers, America Online, Netcom's NetCruiser, etc.). Cyber Patrol was the first parental empowerment application to be compatible with the PICS standard. In February of 1996, Microsystems put the first PICS ratings server on the Internet.

57. The CyberNOT list contains approximately 7000 sites in twelve categories. The software is designed to enable parents to selectively block access to any or all of the twelve CyberNOT categories simply by checking boxes in the Cyber Patrol Headquarters (the Cyber Patrol program manager). These categories are:

*Violence/Profanity:* Extreme cruelty, physical or emotional acts against any animal or person which are primarily intended to hurt or inflict pain. Obscene words, phrases, and profanity defined as text that uses George Carlin's seven censored words more often than once every fifty messages or pages.

*Partial Nudity:* Full or partial exposure of the human anatomy except when exposing genitalia.

*Nudity:* Any exposure of the human genitalia.

*Sexual Acts (graphic or text):* Pictures or text exposing anyone or anything involved in explicit sexual acts and lewd and lascivious behavior, including masturbation, copulation, pedophilia, intimacy and involving nude or partially nude people in heterosexual, bisexual, lesbian or homosexual encounters. Also includes phone sex ads, dating services, adult personals, CD–ROM and videos.

*Gross Depictions (graphic or text):* Pictures or descriptive text of anyone or anything which are crudely vulgar, deficient in civility or behavior, or showing scatological impropriety. Includes such depictions as maiming, bloody figures, indecent depiction of bodily functions.

*Racism/Ethnic Impropriety:* Prejudice or discrimination against any race or ethnic culture. Ethnic or racist jokes and slurs. Any text that elevates one race over another.

*Satanic/Cult:* Worship of the devil; affinity for evil, wickedness. Sects or groups that potentially coerce individuals to grow, and keep, membership.

*Drugs/Drug Culture:* Topics dealing with the use of illegal drugs for entertainment. This would exclude current illegal drugs used for medicinal purposes (e.g., drugs used to treat victims of AIDS). Includes substances used for other than their primary purpose to alter the individual's state of mind such as glue sniffing.

*Militant/Extremist:* Extremely aggressive and combative behaviors, radicalism, advocacy of extreme political measures. Topics include extreme political groups that advocate violence as a means to achieve their goal.

*Gambling:* Of or relating to lotteries, casinos, betting, numbers games, on-line sports or financial betting including nonmonetary dares.

*Questionable/Illegal:* Material or activities of a dubious nature which may be illegal in any or all jurisdictions, such as illegal business schemes, chain letters, software piracy, and copyright infringement.

*Alcohol, Beer & Wine:* Material pertaining to the sale or consumption of alcoholic beverages. Also includes sites and information relating to tobacco products.

58. Microsystems employs people to search the Internet for sites containing material in these categories. Since new sites are constantly coming online, Microsystems updates the CyberNOT list on a weekly basis. Once installed on the home PC, the copy of Cyber Patrol receives automatic updates to

the CyberNOT list over the Internet every seven days.

59. In February of 1996, Microsystems signed a licensing arrangement with Compu-Serve, one of the leading commercial online services with over 4.3 million subscribers. CompuServe provides Cyber Patrol free of charge to its subscribers. Microsystems the same month signed a licensing arrangement with Prodigy, another leading commercial on-line service with over 1.4 million subscribers. Prodigy will provide Cyber Patrol free of charge of its subscribers.

60. Cyber Patrol is also available directly from Microsystems for $49.95, which includes a six month subscription to the CyberNOT blocked sites list (updated automatically once every seven days). After six months, par-ents can receive six months of additional updates for $19.95, or twelve months for $29.95. Cyber Patrol Home Edition, a limit-ed version of Cyber Patrol, is available free of charge on the Internet. To obtain either version, parents download a seven day dem-onstration version of the full Cyber Patrol product from the Microsystems Internet World Wide Web Server. At the end of the seven day trial period, users are offered the opportunity to purchase the complete version of Cyber Patrol or provide Microsystems some basic demographic information in ex-change for unlimited use of the Home Edi-tion. The demographic information is used for marketing and research purposes. Since January of 1996, over 10,000 demonstration copies of Cyber Patrol have been downloaded from Microsystems' Web site.

61. Cyber Patrol is also available from Retail outlets as NetBlocker Plus. Net-Blocker Plus sells for $19.95, which includes five weeks of updates to the CyberNOT list.

62. Microsystems also sells Cyber Patrol into a growing market in schools. As more classrooms become connected to the Inter-net, many teachers want to ensure that their students can receive the benefit of the Inter-net without encountering material they deem educationally inappropriate.

63. Microsystems is working with the Re-creational Software Advisory Council (RSAC), a non-profit corporation which de-veloped rating systems for video games, to implement the RSAC rating system for the Internet.

64. The next release of Cyber Patrol, ex-pected in second quarter of this year, will give parents the ability to use any PICS rating service, including the RSAC rating service, in addition to the Microsystems Cy-berNOT list.

65. In order to speed the implementation of PICS and encourage the development of PICS-compatible Internet applications, Mi-crosystems maintains a server on the Inter-net which contains its CyberNOT list. The server provides software developers with ac-cess to a PICS rating service, and allows software developers to test their products' ability to interpret standard PICS labels. Microsystems is also offering its PICS client test program for Windows free of charge. The client program can be used by develop-ers of PICS rating services to test their services and products.

**SurfWatch**

66. Another software product, Surf-Watch, is also designed to allow parents and other concerned users to filter unwanted ma-terial on the Internet. SurfWatch is avail-able for both Apple Macintosh, Microsoft Windows, and Microsoft Windows 95 Operat-ing Systems, and works with direct Internet Access Providers (e.g., Netcom, PSI, UUnet, AT & T, and more than 1000 other Internet Service Providers).

67. The suggested retail price of Surf-Watch Software is $49.95, with a street price of between $20.00 and $25.00. The product is also available as part of CompuServe/Spry Inc.'s Internet in a Box for Kids, which in-cludes access to Spry's Kids only Internet service and a copy of SurfWatch. Internet in a Box for Kids retails for approximately $30.00. The subscription service, which up-dates the SurfWatch blocked site list auto-matically with new sites each month, is avail-able for $5.95 per month or $60.00 per year. The subscription is included as part of the Internet in a Box for Kids program, and is also provided as a low-cost option from Inter-net Service Providers.

68. SurfWatch is available at over 12,000 retail locations, including National stores such as Comp USA, Egghead Software, Computer City, and several national mail order outlets. SurfWatch can also be ordered directly from its own site on the World Wide Web, and through the Internet Shopping Network.

69. Plaintiffs America Online (AOL), Microsoft Network, and Prodigy all offer parental control options free of charge to their members. AOL has established an online area designed specifically for children. The "Kids Only" parental control feature allows parents to establish an AOL account for their children that accesses only the Kids Only channel on America Online.[15]

70. AOL plans to incorporate PICS-compatible capability into its standard Web browser software, and to make available to subscribers other PICS-compatible Web browsers, such as the Netscape software.

71. Plaintiffs CompuServe and Prodigy give their subscribers the option of blocking all access to the Internet, or to particular media within their proprietary online content, such as bulletin boards and chat rooms.

72. Although parental control software currently can screen for certain suggestive words or for known sexually explicit sites, it cannot now screen for sexually explicit images unaccompanied by suggestive text unless those who configure the software are aware of the particular site.

73. Despite its limitations, currently available user-based software suggests that a reasonably effective method by which parents can prevent their children from accessing sexually explicit and other material which parents may believe is inappropriate for their children will soon be widely available.

### Content on the Internet

74. The types of content now on the Internet defy easy classification. The entire card catalogue of the Carnegie Library is online, together with journals, journal abstracts, popular magazines, and titles of compact discs. The director of the Carnegie Library, Robert Croneberger, testified that on-line services are the emerging trend in libraries generally. Plaintiff Hotwired Ventures LLC organizes its Web site into information regarding travel, news and commentary, arts and entertainment, politics, and types of drinks. Plaintiff America Online, Inc., not only creates chat rooms for a broad variety of topics, but also allows members to create their own chat rooms to suit their own tastes. The ACLU uses an America Online chat room as an unmoderated forum for people to debate civil liberties issues. Plaintiffs' expert, Scott Bradner,[16] estimated that 15,-000 newsgroups exist today, and he described his own interest in a newsgroup devoted solely to Formula 1 racing cars. America Online makes 15,000 bulletin boards available to its subscribers, who post between 200,000 and 250,000 messages each day. Another plaintiffs' expert, Howard Rheingold, participates in "virtual communities" that simulate social interaction. It is no exaggeration to conclude that the content on the Internet is as diverse as human thought.

75. The Internet is not exclusively, or even primarily, a means of commercial communication. Many commercial entities maintain Web sites to inform potential consumers about their goods and services, or to solicit purchases, but many other Web sites exist solely for the dissemination of non-commercial information. The other forms of Internet communication—e-mail, bulletin boards, newsgroups, and chat rooms—frequently have non-commercial goals. For the economic and technical reasons set forth in the following paragraphs, the Internet is an especially attractive means for not-for-profit entities or public interest groups to reach their desired audiences. There are examples in the parties' stipulation of some of the non-commercial uses that the Internet serves.

15. From this point, our Findings are, unless noted, no longer based upon the parties' stipulation, but upon the record adduced at the hearings.

16. Mr. Bradner is a member of the Internet Engineering Task Force, the group primarily responsible for Internet technical standards, as well as other Internet-related associations responsible for, among other things, the prevailing Internet Protocols. He is also associated with Harvard University.

Plaintiff Human Rights Watch, Inc., offers information on its Internet site regarding reported human rights abuses around the world. Plaintiff National Writers Union provides a forum for writers on issues of concern to them. Plaintiff Stop Prisoner Rape, Inc., posts text, graphics, and statistics regarding the incidence and prevention of rape in prisons. Plaintiff Critical Path AIDS Project, Inc., offers information on safer sex, the transmission of HIV, and the treatment of AIDS.

76. Such diversity of content on the Internet is possible because the Internet provides an easy and inexpensive way for a speaker to reach a large audience, potentially of millions. The start-up and operating costs entailed by communication on the Internet are significantly lower than those associated with use of other forms of mass communication, such as television, radio, newspapers, and magazines. This enables operation of their own Web sites not only by large companies, such as Microsoft and Time Warner, but also by small, not-for-profit groups, such as Stop Prisoner Rape and Critical Path AIDS Project. The Government's expert, Dr. Dan R. Olsen,[17] agreed that creation of a Web site would cost between $1,000 and $15,-000, with monthly operating costs depending on one's goals and the Web site's traffic. Commercial online services such as America Online allow subscribers to create Web pages free of charge. Any Internet user can communicate by posting a message to one of the thousands of newsgroups and bulletin boards or by engaging in an on-line "chat", and thereby reach an audience worldwide that shares an interest in a particular topic.

77. The ease of communication through the Internet is facilitated by the use of hypertext markup language (HTML), which allows for the creation of "hyperlinks" or "links". HTML enables a user to jump from one source to other related sources by clicking on the link. A link might take the user from Web site to Web site, or to other files within a particular Web site. Similarly, by typing a request into a search engine, a user can retrieve many different sources of content related to the search that the creators of the engine have collected.

78. Because of the technology underlying the Internet, the statutory term "content provider," [18] which is equivalent to the traditional "speaker," may actually be a hybrid of speakers. Through the use of HTML, for example, Critical Path and Stop Prisoner Rape link their Web sites to several related databases, and a user can immediately jump from the home pages of these organizations to the related databases simply by clicking on a link. America Online creates chat rooms for particular discussions but also allows subscribers to create their own chat rooms. Similarly, a newsgroup gathers postings on a particular topic and distributes them to the newsgroup's subscribers. Users of the Carnegie Library can read on-line versions of *Vanity Fair* and *Playboy*, and America Online's subscribers can peruse the *New York Times, Boating,* and other periodicals. Critical Path, Stop Prisoner Rape, America Online and the Carnegie Library all make available content of other speakers over whom they have little or no editorial control.

79. Because of the different forms of Internet communication, a user of the Internet may speak or listen interchangeably, blurring the distinction between "speakers" and "listeners" on the Internet. Chat rooms, e-mail, and newsgroups are interactive forms of communication, providing the user with the opportunity both to speak and to listen.

80. It follows that unlike traditional media, the barriers to entry as a speaker on the Internet do not differ significantly from the barriers to entry as a listener. Once one has entered cyberspace, one may engage in the dialogue that occurs there. In the *argot* of

---

**17.** Dr. Olsen chairs the Computer Science Department at Brigham Young University in Provo, Utah, and is the recently-appointed Director of the Human Computer Interaction Institute at Carnegie–Mellon University in Pittsburgh, Pennsylvania.

**18.** The term "information content provider" is defined in § 509 of the CDA, at the new 47 U.S.C. § 230(e)(3), as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."

the medium, the receiver can and does become the content provider, and vice-versa.

81. The Internet is therefore a unique and wholly new medium of worldwide human communication.

## Sexually Explicit Material
## On the Internet

82. The parties agree that sexually explicit material exists on the Internet. Such material includes text, pictures, and chat, and includes bulletin boards, newsgroups, and the other forms of Internet communication, and extends from the modestly titillating to the hardest-core.

83. There is no evidence that sexually-oriented material is the primary type of content on this new medium. Purveyors of such material take advantage of the same ease of access available to all users of the Internet, including establishment of a Web site.

84. Sexually explicit material is created, named, and posted in the same manner as material that is not sexually explicit. It is possible that a search engine can accidentally retrieve material of a sexual nature through an imprecise search, as demonstrated at the hearing. Imprecise searches may also retrieve irrelevant material that is not of a sexual nature. The accidental retrieval of sexually explicit material is one manifestation of the larger phenomenon of irrelevant search results.

85. Once a provider posts content on the Internet, it is available to all other Internet users worldwide. Similarly, once a user posts a message to a newsgroup or bulletin board, that message becomes available to all subscribers to that newsgroup or bulletin board. For example, when the UCR/California Museum of Photography posts to its Web site nudes by Edward Weston and Robert Mapplethorpe to announce that its new exhibit will travel to Baltimore and New York City, those images are available not only in Los Angeles, Baltimore, and New York City, but also in Cincinnati, Mobile, or Beijing—wherever Internet users live. Similarly, the safer sex instructions that Critical Path posts to its Web site, written in street language so that the teenage receiver can understand them, are available not just in Philadelphia, but also in Provo and Prague. A chat room organized by the ACLU to discuss the United States Supreme Court's decision in *FCC v. Pacifica Foundation* would transmit George Carlin's seven dirty words to anyone who enters. Messages posted to a newsgroup dedicated to the Oklahoma City bombing travel to all subscribers to that newsgroup.

86. Once a provider posts its content on the Internet, it cannot prevent that content from entering any community. Unlike the newspaper, broadcast station, or cable system, Internet technology necessarily gives a speaker a potential worldwide audience. Because the Internet is a network of networks (as described above in Findings 1 through 4), any network connected to the Internet has the capacity to send and receive information to any other network. Hotwired Ventures, for example, cannot prevent its materials on mixology from entering communities that have no interest in that topic.

87. Demonstrations at the preliminary injunction hearings showed that it takes several steps to enter cyberspace. At the most fundamental level, a user must have access to a computer with the ability to reach the Internet (typically by way of a modem). A user must then direct the computer to connect with the access provider, enter a password, and enter the appropriate commands to find particular data. On the World Wide Web, a user must normally use a search engine or enter an appropriate address. Similarly, accessing newsgroups, bulletin boards, and chat rooms requires several steps.

88. Communications over the Internet do not "invade" an individual's home or appear on one's computer screen unbidden. Users seldom encounter content "by accident." A document's title or a description of the document will usually appear before the document itself takes the step needed to view it, and in many cases the user will receive detailed information about a site's content before he or she need take the step to access the document. Almost all sexually explicit images are preceded by warnings as to the content. Even the Government's witness, Agent Howard Schmidt, Director of the Air

Force Office of Special Investigation, testified that the "odds are slim" that a user would come across a sexually explicit site by accident.

89. Evidence adduced at the hearing showed significant differences between Internet communications and communications received by radio or television. Although content on the Internet is just a few clicks of a mouse away from the user, the receipt of information on the Internet requires a series of affirmative steps more deliberate and directed than merely turning a dial. A child requires some sophistication and some ability to read to retrieve material and thereby to use the Internet unattended.

### Obstacles to Age Verification on the Internet

90. There is no effective way to determine the identity or the age of a user who is accessing material through e-mail, mail exploders, newsgroups or chat rooms. An e-mail address provides no authoritative information about the addressee, who may use an e-mail "alias" or an anonymous remailer. There is also no universal or reliable listing of e-mail addresses and corresponding names or telephone numbers, and any such listing would be or rapidly become incomplete. For these reasons, there is no reliable way in many instances for a sender to know if the e-mail recipient is an adult or a minor. The difficulty of e-mail age verification is compounded for mail exploders such as listservs, which automatically send information to all e-mail addresses on a sender's list. Government expert Dr. Olsen agreed that no current technology could give a speaker assurance that only adults were listed in a particular mail exploder's mailing list.

91. Because of similar technological difficulties, individuals posting a message to a newsgroup or engaging in chat room discussions cannot ensure that all readers are adults, and Dr. Olsen agreed. Although some newsgroups are moderated, the moderator's control is limited to what is posted and the moderator cannot control who receives the messages.

92. The Government offered no evidence that there is a reliable way to ensure that recipients and participants in such fora can be screened for age. The Government presented no evidence demonstrating the feasibility of its suggestion that chat rooms, newsgroups and other fora that contain material deemed indecent could be effectively segregated to "adult" or "moderated" areas of cyberspace.

93. Even if it were technologically feasible to block minors' access to newsgroups and similar fora, there is no method by which the creators of newsgroups which contain discussions of art, politics or any other subject that could potentially elicit "indecent" contributions could limit the blocking of access by minors to such "indecent" material and still allow them access to the remaining content, even if the overwhelming majority of that content was not indecent.

94. Likewise, participants in MUDs (Multi-User Dungeons) and MUSEs (Multi-User Simulation Environments) do not know whether the other participants are adults or minors. Although MUDs and MUSEs require a password for permanent participants, they need not give their real name nor verify their age, and there is no current technology to enable the administrator of these fantasy worlds to know if the participant is an adult or a minor.

95. Unlike other forms of communication on the Internet, there is technology by which an operator of a World Wide Web server may interrogate a user of a Web site. An HTML document can include a fill-in-the-blank "form" to request information from a visitor to a Web site, and this information can be transmitted back to the Web server and be processed by a computer program, usually a Common Gateway Interface (cgi) script. The Web server could then grant or deny access to the information sought. The cgi script is the means by which a Web site can process a fill-in form and thereby screen visitors by requesting a credit card number or adult password.

96. Content providers who publish on the World Wide Web via one of the large commercial online services, such as America Online or CompuServe, could not use an online age verification system that requires cgi

script because the server software of these online services available to subscribers cannot process cgi scripts. There is no method currently available for Web page publishers who lack access to cgi scripts to screen recipients online for age.

### The Practicalities of the Proffered Defenses

Note: The Government contends the CDA makes available three potential defenses to all content providers on the Internet: credit card verification, adult verification by password or adult identification number, and "tagging".

### Credit Card Verification

97. Verification [19] of a credit card number over the Internet is not now technically possible. Witnesses testified that neither Visa nor Mastercard considers the Internet to be sufficiently secure under the current technology to process transactions in that manner. Although users can and do purchase products over the Internet by transmitting their credit card number, the seller must then process the transaction with Visa or Mastercard off-line using phone lines in the traditional way. There was testimony by several witnesses that Visa and Mastercard are in the process of developing means of credit card verification over the Internet.

98. Verification by credit card, if and when operational, will remain economically and practically unavailable for many of the non-commercial plaintiffs in these actions. The Government's expert "suspect[ed]" that verification agencies would decline to process a card unless it accompanied a commercial transaction. There was no evidence to the contrary.

99. There was evidence that the fee charged by verification agencies to process a card, whether for a purchase or not, will preclude use of the credit-card verification defense by many non-profit, non-commercial Web sites, and there was no evidence to the contrary. Plaintiffs' witness Patricia Nell Warren, an author whose free Web site al-lows users to purchase gay and lesbian literature, testified that she must pay $1 per verification to a verification agency. Her Web site can absorb this cost because it arises in connection with the sale of books available there.

100. Using credit card possession as a surrogate for age, and requiring use of a credit card to enter a site, would impose a significant economic cost on non-commercial entities. Critical Path, for example, received 3,300 hits daily from February 4 through March 4, 1996. If Critical Path must pay a fee every time a user initially enters its site, then, to provide free access to its non-commercial site, it would incur a monthly cost far beyond its modest resources. The ACLU's Barry Steinhardt testified that maintenance of a credit card verification system for all visitors to the ACLU's Web site would require it to shut down its Web site because the projected cost would exceed its budget.

101. Credit card verification would significantly delay the retrieval of information on the Internet. Dr. Olsen, the expert testifying for the Government, agreed that even "a minute is [an] absolutely unreasonable [delay] ... [P]eople will not put up with a minute." Plaintiffs' expert Donna Hoffman similarly testified that excessive delay disrupts the "flow" on the Internet and stifles both "hedonistic" and "goal-directed" browsing.

102. Imposition of a credit card requirement would completely bar adults who do not have a credit card and lack the resources to obtain one from accessing any blocked material. At this time, credit card verification is effectively unavailable to a substantial number of Internet content providers as a potential defense to the CDA.

### Adult Verification by Password

103. The Government offered very limited evidence regarding the operation of existing age verification systems, and the evidence offered was not based on personal knowledge. AdultCheck and Verify, existing systems which appear to be used for access-

---

**19.** By "verification", we mean the method by which a user types in his or her credit card number, and the Web site ensures that the credit card is valid before it allows the user to enter the site.

ing commercial pornographic sites, charge users for their services. Dr. Olsen admitted that his knowledge of these services was derived primarily from reading the advertisements on their Web pages. He had not interviewed any employees of these entities, had not personally used these systems, had no idea how many people are registered with them, and could not testify to the reliability of their attempt at age verification.

104. At least some, if not almost all, non-commercial organizations, such as the ACLU, Stop Prisoner Rape or Critical Path AIDS Project, regard charging listeners to access their speech as contrary to their goals of making their materials available to a wide audience free of charge.

105. It would not be feasible for many non-commercial organizations to design their own adult access code screening systems because the administrative burden of creating and maintaining a screening system and the ongoing costs involved is beyond their reach. There was testimony that the costs would be prohibitive even for a commercial entity such as HotWired, the online version of Wired magazine.

106. There is evidence suggesting that adult users, particularly casual Web browsers, would be discouraged from retrieving information that required use of a credit card or password. Andrew Anker testified that HotWired has received many complaints from its members about HotWired's registration system, which requires only that a member supply a name, e-mail address and self-created password. There is concern by commercial content providers that age verification requirements would decrease advertising and revenue because advertisers depend on a demonstration that the sites are widely available and frequently visited.

107. Even if credit card verification or adult password verification were implemented, the Government presented no testimony as to how such systems could ensure that the user of the password or credit card is in fact over 18. The burdens imposed by credit card verification and adult password verification systems make them effectively unavailable to a substantial number of Internet content providers.

### The Government's "Tagging" Proposal

108. The feasibility and effectiveness of "tagging" to restrict children from accessing "indecent" speech, as proposed by the Government has not been established. "Tagging" would require content providers to label all of their "indecent" or "patently offensive" material by imbedding a string of characters, such as "XXX," in either the URL or HTML. If a user could install software on his or her computer to recognize the "XXX" tag, the user could screen out any content with that tag. Dr. Olsen proposed a "–L18" tag, an idea he developed for this hearing in response to Mr. Bradner's earlier testimony that certain tagging would not be feasible.

109. The parties appear to agree that it is technologically feasible—"trivial", in the words of plaintiffs' expert—to imbed tags in URLs and HTML, and the technology of tagging underlies both plaintiffs' PICS proposal and the Government's "–L18" proposal.

110. The Government's tagging proposal would require all content providers that post arguably "indecent" material to review all of their online content, a task that would be extremely burdensome for organizations that provide large amounts of material online which cannot afford to pay a large staff to review all of that material. The Carnegie Library would be required to hire numerous additional employees to review its online files at an extremely high cost to its limited budget. The cost and effort would be substantial for the Library and frequently prohibitive for others. Witness Kiroshi Kuromiya testified that it would be impossible for his organization, Critical Path, to review all of its material because it has only one full and one part-time employee.

111. The task of screening and tagging cannot be done simply by using software which screens for certain words, as Dr. Olsen acknowledged, and we find that determinations as to what is indecent require human judgment.

112. In lieu of reviewing each file individually, a content provider could tag its entire site but this would prevent minors from ac-

cessing much material that is not "indecent" under the CDA.

113. To be effective, a scheme such as the –L18 proposal would require a worldwide consensus among speakers to use the same tag to label "indecent" material. There is currently no such consensus, and no Internet speaker currently labels its speech with the –L18 code or with any other widely-recognized label.

114. Tagging also assumes the existence of software that recognizes the tags and takes appropriate action when it notes tagged speech. Neither commercial Web browsers nor user-based screening software is currently configured to block a –L18 code. Until such software exists, all speech on the Internet will continue to travel to whomever requests it, without hindrance. Labelling speech has no effect in itself on the transmission (or not) of that speech. Neither plaintiffs nor the Government suggest that tagging alone would shield minors from speech or insulate a speaker from criminal liability under the CDA. It follows that all speech on any topic that is available to adults will also be available to children using the Internet (unless it is blocked by screening software running on the computer the child is using).

115. There is no way that a speaker can use current technology to know if a listener is using screening software.

116. Tags can not currently activate or deactivate themselves depending on the age or location of the receiver. Critical Path, which posts on-line safer sex instructions, would be unable to imbed tags that block its speech only in communities where it may be regarded as indecent. Critical Path, for example, must choose either to tag its site (blocking its speech in all communities) or not to tag, blocking its speech in none.

### The Problems of Offshore Content and Caching

117. A large percentage, perhaps 40% or more, of content on the Internet originates

outside the United States. At the hearing, a witness demonstrated how an Internet user could access a Web site of London (which presumably is on a server in England), and then link to other sites of interest in England. A user can sometimes discern from a URL that content is coming from overseas, since InterNIC allows a content provider to imbed a country code in a domain name.[20] Foreign content is otherwise indistinguishable from domestic content (as long as it is in English), since foreign speech is created, named, and posted in the same manner as domestic speech. There is no requirement that foreign speech contain a country code in its URL. It is undisputed that some foreign speech that travels over the Internet is sexually explicit.

118. The use of "caching" makes it difficult to determine whether the material originated from foreign or domestic sources. Because of the high cost of using the trans-Atlantic and trans-Pacific cables, and because the high demand on those cables leads to bottleneck delays, content is often "cached", or temporarily stored, on servers in the United States. Material from a foreign source in Europe can travel over the trans-Atlantic cable to the receiver in the United States, and pass through a domestic caching server which then stores a copy for subsequent retrieval. This domestic caching server, rather than the original foreign server, will send the material from the cache to the subsequent receivers, without placing a demand on the trans-oceanic cables. This shortcut effectively eliminates most of the distance for both the request and the information and, hence, most of the delay. The caching server discards the stored information according to its configuration (e.g., after a certain time or as the demand for the information diminishes). Caching therefore advances core Internet values: the cheap and speedy retrieval of information.

119. Caching is not merely an international phenomenon. Domestic content pro-

---

**20.** InterNIC is a naming organization, not a regulator of content. InterNIC and two other European organizations maintain a master list of domain names to ensure that no duplication occurs. Creators of Web sites must register their domain name with InterNIC, and the agency will instruct the creator to choose another name if the new Web site has the name of an already-existing site. InterNIC has no control over content on a site after registration.

viders store popular domestic material on their caching servers to avoid the delay of successive searches for the same material and to decrease the demand on their Internet connection. America Online can cache the home page of the *New York Times* on its servers when a subscriber first requests it, so that subsequent subscribers who make the same request will receive the same home page, but from America Online's caching service rather than from the *New York Times's* server.[21]

120. Put simply, to follow the example in the prior paragraph, America Online has no control over the content that the *New York Times* posts to its Web site, and the *New York Times* has no control over America Online's distribution of that content from a caching server.

### Anonymity

121. Anonymity is important to Internet users who seek to access sensitive information, such as users of the Critical Path AIDS Project's Web site, the users, particularly gay youth, of Queer Resources Directory, and users of Stop Prisoner Rape (SPR). Many members of SPR's mailing list have asked to remain anonymous due to the stigma of prisoner rape.

### Plaintiffs' Choices Under the CDA

122. Many speakers who display arguably indecent content on the Internet must choose between silence and the risk of prosecution. The CDA's defenses—credit card verification, adult access codes, and adult personal identification numbers—are effectively unavailable for non-commercial, not-for-profit entities.

123. The plaintiffs in this action are businesses, libraries, non-commercial and not-for-profit organizations, and educational societies and consortia. Although some of the material that plaintiffs post online—such as information regarding protection from AIDS, birth control or prison rape—is sexually explicit and may be considered "indecent" or "patently offensive" in some communities,

---

**21.** This paragraph and the preceding paragraph also illustrate that a content provider might store its own material or someone else's on a caching

none of the plaintiffs is a commercial purveyor of what is commonly termed "pornography."

## III.

### CONCLUSIONS OF LAW

■ Plaintiffs have established a reasonable probability of eventual success in the litigation by demonstrating that §§ 223(a)(1)(B) and 223(a)(2) of the CDA are unconstitutional on their face to the extent that they reach indecency. Sections 223(d)(1) and 223(d)(2) of the CDA are unconstitutional on their face. Accordingly, plaintiffs have shown irreparable injury, no party has any interest in the enforcement of an unconstitutional law, and therefore the public interest will be served by granting the preliminary injunction. *Elrod v. Burns,* 427 U.S. 347, 373–74, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976); *Hohe v. Casey,* 868 F.2d 69, 72 (3d Cir.), *cert. denied,* 493 U.S. 848, 110 S.Ct. 144, 107 L.Ed.2d 102 (1989); *Acierno v. New Castle County,* 40 F.3d 645, 653 (3d Cir.1994). The motions for preliminary injunction will therefore be granted.

The views of the members of the Court in support of these conclusions follow.

SLOVITER, *Chief Circuit Judge:*

### A.

### Statutory Provisions

As noted in Part I, Introduction, the plaintiffs' motion for a preliminary injunction is confined to portions of two provisions of the Communications Decency Act of 1996, § 223(a) and § 223(d), which they contend violate their First Amendment free speech and Fifth Amendment due process rights. To facilitate reference, I set forth those provisions in full. Section 223(a), the "indecency" provision, subjects to criminal penalties of imprisonment of no more than two years or a fine or both anyone who:

---

server. The goal—saving money and time—is the same in both cases.

1) in interstate or foreign communications . . .

(B) by means of a telecommunications device knowingly—

(i) makes, creates, or solicits, and

(ii) initiates the transmission of, any comment, request, suggestion, proposal, image, or other communication which is obscene *or indecent,* knowing that the recipient of the communication is under 18 years of age, regardless of whether the maker of such communication placed the call or initiated the communication; . . .

(2) knowingly permits any telecommunications facility under his control to be used for any activity prohibited by paragraph (1) with the intent that it be used for such activity.

(emphasis added).

The term "telecommunications device" is specifically defined not to include "the use of an interactive computer service," as that is covered by section 223(d)(1).

Section 223(d), the "patently offensive" provision, subjects to criminal penalties anyone who:

(1) in interstate or foreign communications knowingly—

(A) uses an interactive computer service to send to a specific person or persons under 18 years of age, or

(B) uses any interactive computer service to display in a manner available to a person under 18 years of age, any comment, request, suggestion, proposal, image or other communication that, *in context, depicts or describes, in terms patently offensive as measured by contemporary community standards, sexual or excretory activities or organs,* regardless of whether the use of such service placed the call or initiated the communication; or

(2) knowingly permits any telecommunications facility under such person's control to be used for an activity prohibited by para-

graph (1) with the intent that it be used for such activity.

(emphasis added).

Two aspects of these provisions stand out. First, we are dealing with criminal provisions, subjecting violators to substantial penalties. Second, the provisions on indecent and patently offensive communications are not parallel.

The government uses the term "indecent" interchangeably with "patently offensive" and advises that it so construes the statute in light of the legislative history and the Supreme Court's analysis of the word "indecent" in *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). However, the CDA does not define "indecent." Notwithstanding Congress' familiarity with *Pacifica,* it enacted § 223(a), covering "indecent" communications, without any language confining "indecent" to descriptions or depictions of "sexual or excretory activities or organs," language it included in the reference to "patently offensive" in § 223(d)(1)(B). Nor does § 223(a) contain the phrase "in context," which the government believes is relevant.

The failure to define "indecent" in § 223(a) is thus arguably a negative pregnant and subject to "the rule of construction that an express statutory requirement here, contrasted with statutory silence there, shows an intent to confine the requirement to the specified instance." *Field v. Mans,* —— U.S. ——, ——, 116 S.Ct. 437, 442, 133 L.Ed.2d 351 (1995). *See also Gozlon–Peretz v. United States,* 498 U.S. 395, 404, 111 S.Ct. 840, 846–47, 112 L.Ed.2d 919 (1991) (" '[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion' ") (quoting *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983)).

Plaintiffs note the difference but do not press this as a basis for distinguishing between the two sections in their preliminary injunction arguments and therefore I will also use the words interchangeably for this purpose, leaving open the issue for consider-

ation at the final judgment stage if it becomes relevant.

## B.

### Preliminary Injunction Standard

■ To obtain a preliminary injunction, plaintiffs must establish that they are likely to prevail on the merits and that they will suffer irreparable harm if injunctive relief is not granted. We also must consider whether the potential harm to the defendant from issuance of a temporary restraining order outweighs possible harm to the plaintiffs if such relief is denied, and whether the granting of injunctive relief is in the public interest. *See Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 90–91 (3d Cir.1992); *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1175 (3d Cir.1990).

In a case in which the injury alleged is a threat to First Amendment interests, the finding of irreparable injury is often tied to the likelihood of success on the merits. In *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), the Supreme Court emphasized that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* at 373, 96 S.Ct. at 2690 (citing *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)).

Subjecting speakers to criminal penalties for speech that is constitutionally protected in itself raises the spectre of irreparable harm. Even if a court were unwilling to draw that conclusion from the language of the statute itself, plaintiffs have introduced ample evidence that the challenged provisions, if not enjoined, will have a chilling effect on their free expression. Thus, this is not a case in which we are dealing with a mere incidental inhibition on speech, *see Hohe v. Casey,* 868 F.2d 69, 73 (3d Cir.), *cert. denied,* 493 U.S. 848, 110 S.Ct. 144, 107 L.Ed.2d 102 (1989), but with a regulation that directly penalizes speech.

Nor could there be any dispute about the public interest factor which must be taken into account before a court grants a preliminary injunction. No long string of citations is necessary to find that the public interest weighs in favor of having access to a free flow of constitutionally protected speech. *See, e.g., Turner Broadcasting System, Inc. v. FCC,* —— U.S. ——, ——, 114 S.Ct. 2445, 2458, 129 L.Ed.2d 497 (1994); *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 763–65, 96 S.Ct. 1817, 1826–27, 48 L.Ed.2d 346 (1976).

Thus, if plaintiffs have shown a likelihood of success on the merits, they will have shown the irreparable injury needed to entitle them to a preliminary injunction.

## C.

### Applicable Standard of Review

The CDA is patently a government-imposed content-based restriction on speech, and the speech at issue, whether denominated "indecent" or "patently offensive," is entitled to constitutional protection. *See Sable Communications of California, Inc. v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 2836–37, 106 L.Ed.2d 93 (1989). As such, the regulation is subject to strict scrutiny, and will only be upheld if it is justified by a compelling government interest and if it is narrowly tailored to effectuate that interest. *Sable,* 492 U.S. at 126, 109 S.Ct. at 2836–37; *see also Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2459 (1994). "[T]he benefit gained [by a content-based restriction] must outweigh the loss of constitutionally protected rights." *Elrod v. Burns,* 427 U.S. at 363, 96 S.Ct. at 2685.

The government's position on the applicable standard has been less than pellucid but, despite some references to a somewhat lesser burden employed in broadcasting cases, it now appears to have conceded that it has the burden of proof to show both a compelling interest and that the statute regulates least restrictively. Tr. of Preliminary Injunction Hearing at 121 (May 10, 1996). In any event, the evidence and our Findings of Fact based thereon show that Internet communication, while unique, is more akin to telephone communication, at issue in *Sable,* than to broadcasting, at issue in *Pacifica,* because, as with the telephone, an Internet user must act affirmatively and deliberately to retrieve

specific information online. Even if a broad search will, on occasion, retrieve unwanted materials, the user virtually always receives some warning of its content, significantly reducing the element of surprise or "assault" involved in broadcasting. Therefore, it is highly unlikely that a very young child will be randomly "surfing" the Web and come across "indecent" or "patently offensive" material.

Judge Dalzell's separate opinion fully explores the reasons for the differential treatment of radio and television broadcasting for First Amendment purposes from that accorded other means of communication. It follows that to the extent the Court employed a less than strict scrutiny standard of review in *Pacifica* and other broadcasting cases, *see, e.g., Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), there is no reason to employ a less than strict scrutiny standard of review in this case.

### D.

#### *The Nature of the Government's Interest*

The government asserts that shielding minors from access to indecent materials is the compelling interest supporting the CDA. It cites in support the statements of the Supreme Court that "[i]t is evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling,'" *New York v. Ferber,* 458 U.S. 747, 756–57, 102 S.Ct. 3348, 3354, 73 L.Ed.2d 1113 (1982) (quoting *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 607, 102 S.Ct. 2613, 2620, 73 L.Ed.2d 248 (1982)), and "there is a compelling interest in protecting the physical and psychological well-being of minors. This interest extends to shielding minors from the influence of literature that is not obscene by adult standards." *Sable,* 492 U.S. at 126, 109 S.Ct. at 2836. It also cites the similar quotation appearing in *Fabulous Assoc., Inc. v. Pennsylvania Public Utility Comm'n,* 896 F.2d 780, 787 (3d Cir.1990).

Those statements were made in cases where the potential harm to children from the material was evident. *Ferber* involved

the constitutionality of a statute which prohibited persons from knowingly promoting sexual performances by children under 16 and distributing material depicting such performances. *Sable* and *Fabulous* involved the FCC's ban on "dial-a-porn" (dealing by definition with pornographic telephone messages). In contrast to the material at issue in those cases, at least some of the material subject to coverage under the "indecent" and "patently offensive" provisions of the CDA may contain valuable literary, artistic or educational information of value to older minors as well as adults. The Supreme Court has held that "minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 212–213, 95 S.Ct. 2268, 2274, 45 L.Ed.2d 125 (1975) (citations omitted).

In *Erznoznik,* the Court rejected an argument that an ordinance prohibiting the display of films containing nudity at drive-in movie theatres served a compelling interest in protecting minor passersby from the influence of such films. The Court held that the prohibition was unduly broad, and explained that "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." 422 U.S. at 213–14, 95 S.Ct. at 2275. As Justice Scalia noted in *Sable,* "[t]he more pornographic what is embraced within the ... category of 'indecency,' the more reasonable it becomes to insist upon greater assurance of insulation from minors." *Sable,* 492 U.S. at 132, 109 S.Ct. at 2840 (Scalia, J., concurring). It follows that where non-pornographic, albeit sexually explicit, material also falls within the sweep of the statute, the interest will not be as compelling.

In part, our consideration of the government's showing of a "compelling interest" trenches upon the vagueness issue, discussed in detail in Judge Buckwalter's opinion but equally pertinent to First Amendment analysis. Material routinely acceptable according to the standards of New York City, such as

the Broadway play *Angels in America* which concerns homosexuality and AIDS portrayed in graphic language, may be far less acceptable in smaller, less cosmopolitan communities of the United States. Yet the play garnered two Tony Awards and a Pulitzer prize for its author, and some uninhibited parents and teachers might deem it to be material to be read or assigned to eleventh and twelfth graders. If available on the Internet through some libraries, the text of the play would likely be accessed in that manner by at least some students, and it would also arguably fall within the scope of the CDA.

There has been recent public interest in the female genital mutilation routinely practiced and officially condoned in some countries. News articles have been descriptive, and it is not stretching to assume that this is a subject that occupies news groups and chat rooms on the Internet. We have no assurance that these discussions, of obvious interest and relevance to older teenage girls, will not be viewed as patently offensive—even in context—in some communities.

Other illustrations abound of non-obscene material likely to be available on the Internet but subject to the CDA's criminal provisions. Photographs appearing in National Geographic or a travel magazine of the sculptures in India of couples copulating in numerous positions, a written description of a brutal prison rape, or Francesco Clemente's painting "Labirinth," *see* Def.Exh. 125, all might be considered to "depict or describe, in terms patently offensive as measured by contemporary community standards, sexual or excretory activities or organs." 47 U.S.C. § 223(d)(1). But the government has made no showing that it has a compelling interest in preventing a seventeen-year-old minor from accessing such images.

By contrast, plaintiffs presented testimony that material that could be considered indecent, such as that offered by Stop Prisoner Rape or Critical Path AIDS project, may be critically important for certain older minors. For example, there was testimony that one quarter of all new HIV infections in the United States is estimated to occur in young people between the ages of 13 and 20, an estimate the government made no effort to rebut. The witnesses believed that graphic material that their organizations post on the Internet could help save lives, but were concerned about the CDA's effect on their right to do so.

The government counters that this court should defer to legislative conclusions about this matter. However, where First Amendment rights are at stake, "[d]eference to a legislative finding cannot limit judicial inquiry." *Sable,* 492 U.S. at 129, 109 S.Ct. at 2838 (quoting *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 843, 98 S.Ct. 1535, 1544, 56 L.Ed.2d 1 (1978)). "[W]hatever deference is due legislative findings would not foreclose our independent judgment of the facts bearing on an issue of constitutional law." *Id.*

Moreover, it appears that the legislative "findings" the government cites concern primarily testimony and statements by legislators about the prevalence of obscenity, child pornography, and sexual solicitation of children on the Internet. Similarly, at the hearings before us the government introduced exhibits of sexually explicit material through the testimony of Agent Howard Schmidt, which consisted primarily of the same type of hard-core pornographic materials (even if not technically obscene) which concerned Congress and which fill the shelves of "adult" book and magazine stores. Plaintiffs emphasize that they do not challenge the Act's restrictions on speech not protected by the First Amendment, such as obscenity, child pornography or harassment of children. Their suit is based on their assertion, fully supported by their evidence and our findings, that the CDA reaches much farther.

I am far less confident than the government that its quotations from earlier cases in the Supreme Court signify that it has shown a compelling interest in regulating the vast range of online material covered or potentially covered by the CDA. Nonetheless, I acknowledge that there is certainly a compelling government interest to shield a substantial number of minors from some of the online material that motivated Congress to enact the CDA, and do not rest my decision on the inadequacy of the government's showing in this regard.

### E.

### *The Reach of the Statute*

Whatever the strength of the interest the government has demonstrated in preventing minors from accessing "indecent" and "patently offensive" material online, if the means it has chosen sweeps more broadly than necessary and thereby chills the expression of adults, it has overstepped onto rights protected by the First Amendment. *Sable*, 492 U.S. at 131, 109 S.Ct. at 2839.

The plaintiffs argue that the CDA violates the First Amendment because it effectively bans a substantial category of protected speech from most parts of the Internet. The government responds that the Act does not on its face or in effect ban indecent material that is constitutionally protected for adults. Thus one of the factual issues before us was the likely effect of the CDA on the free availability of constitutionally protected material. A wealth of persuasive evidence, referred to in detail in the Findings of Fact, proved that it is either technologically impossible or economically prohibitive for many of the plaintiffs to comply with the CDA without seriously impeding their posting of online material which adults have a constitutional right to access.

With the possible exception of an e-mail to a known recipient, most content providers cannot determine the identity and age of every user accessing their material. Considering separately content providers that fall roughly into two categories, we have found that no technology exists which allows those posting on the category of newsgroups, mail exploders or chat rooms to screen for age. Speakers using those forms of communication cannot control who receives the communication, and in most instances are not aware of the identity of the recipients. If it is not feasible for speakers who communicate via these forms of communication to conduct age screening, they would have to reduce the level of communication to that which is appropriate for children in order to be protected under the statute. This would effect a complete ban even for adults of some expression, albeit "indecent," to which they are constitutionally entitled, and thus would be unconstitutional under the holding in *Sable*, 492 U.S. at 131, 109 S.Ct. at 2839.

Even as to content providers in the other broad category, such as the World Wide Web, where efforts at age verification are technically feasible through the use of Common Gateway Interface (cgi) scripts (which enable creation of a document that can process information provided by a Web visitor), the Findings of Fact show that as a practical matter, non-commercial organizations and even many commercial organizations using the Web would find it prohibitively expensive and burdensome to engage in the methods of age verification proposed by the government, and that even if they could attempt to age verify, there is little assurance that they could successfully filter out minors.

The government attempts to circumvent this problem by seeking to limit the scope of the statute to those content providers who are commercial pornographers, and urges that we do likewise in our obligation to save a congressional enactment from facial unconstitutionality wherever possible. But in light of its plain language and its legislative history, the CDA cannot reasonably be read as limited to commercial pornographers. A court may not impose a narrowing construction on a statute unless it is "readily susceptible" to such a construction. *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 397, 108 S.Ct. 636, 645, 98 L.Ed.2d 782 (1988). The court may not "rewrite a . . . law to conform it to constitutional requirements." *Id.* Although we may prefer an interpretation of a statute that will preserve the constitutionality of the statutory scheme, *United States v. Clark*, 445 U.S. 23, 27, 100 S.Ct. 895, 899–900, 63 L.Ed.2d 171 (1980), we do not have license to rewrite a statute to "create distinctions where none were intended." *American Tobacco Co. v. Patterson*, 456 U.S. 63, 72 n. 6, 102 S.Ct. 1534, 1539 n. 6, 71 L.Ed.2d 748 (1982); *see also Consumer Party v. Davis*, 778 F.2d 140, 147 (3d Cir.1985). The Court has often stated that "absent a clearly expressed legislative intention to the contrary, [statutory] language must ordinarily be regarded as conclusive." *Escondido Mut. Water Co. v. La Jolla Band of Mission Indians*, 466 U.S. 765, 772, 104 S.Ct. 2105, 2110, (1984)

(quoting *North Dakota v. United States,* 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983)).

It is clear from the face of the CDA and from its legislative history that Congress did not intend to limit its application to commercial purveyors of pornography. Congress unquestionably knew how to limit the statute to such entities if that was its intent, and in fact it did so in provisions relating to dial-a-porn services. *See* 47 U.S.C. § 223(b)(2)(A) (criminalizing making any indecent telephone communication *"for commercial purposes"*). It placed no similar limitation in the CDA. Moreover, the Conference Report makes clear that Congress did not intend to limit the application of the statute to content providers such as those which make available the commercial material contained in the government's exhibits, and confirms that Congress intended "content regulation of both commercial and non-commercial providers." Conf.Rep. at 191. *See also,* 141 Cong. Rec. S8089 (daily ed. June 9, 1995) (Statement of Senator Exon).

The scope of the CDA is not confined to material that has a prurient interest or appeal, one of the hallmarks of obscenity, because Congress sought to reach farther. Nor did Congress include language that would define "patently offensive" or "indecent" to exclude material of serious value. It follows that to narrow the statute in the manner the government urges would be an impermissible exercise of our limited judicial function, which is to review the statute as written for its compliance with constitutional mandates.

I conclude inexorably from the foregoing that the CDA reaches speech subject to the full protection of the First Amendment, at least for adults.[1] In questions of the witnesses and in colloquy with the government attorneys, it became evident that even if "indecent" is read as parallel to "patently offensive," the terms would cover a broad range of material from contemporary films, plays and books showing or describing sexual activities (*e.g., Leaving Las Vegas*) to con-

troversial contemporary art and photographs showing sexual organs in positions that the government conceded would be patently offensive in some communities (*e.g.,* a Robert Mapplethorpe photograph depicting a man with an erect penis).

We have also found that there is no effective way for many Internet content providers to limit the effective reach of the CDA to adults because there is no realistic way for many providers to ascertain the age of those accessing their materials. As a consequence, we have found that "[m]any speakers who display arguably indecent content on the Internet must choose between silence and the risk of prosecution." Such a choice, forced by sections 223(a) and (d) of the CDA, strikes at the heart of speech of adults as well as minors.

### F.

### *Whether CDA is Narrowly Tailored*

In the face of such a patent intrusion on a substantial category of protected speech for adults, there is some irony in considering whether the statute is narrowly tailored or, as sometimes put, whether Congress has used the least restrictive means to achieve a compelling government interest. *See Sable,* 492 U.S. at 126, 109 S.Ct. at 2836–37. It would appear that the extent of the abridgement of the protected speech of adults that it has been shown the CDA would effect is too intrusive to be outweighed by the government's asserted interest, whatever its strength, in protecting minors from access to indecent material. Nonetheless, the formulation of the inquiry requires that we consider the government's assertion that the statute is narrowly drafted, and I proceed to do so.

In this case, the government relies on the statutory defenses for its argument of narrow tailoring. There are a number of reasons why I am not persuaded that the statutory defenses can save the CDA from a conclusion of facial unconstitutionality.

First, it is difficult to characterize a criminal statute that hovers over each content

---

1. It also probably covers speech protected by the First Amendment for some minors a well, because it fails to limit its reach to that which is

harmful for minors, an issue which it is not necessary to decide in light of the other conclusions reached.

provider, like the proverbial sword of Damocles, as a narrow tailoring. Criminal prosecution, which carries with it the risk of public obloquy as well as the expense of court preparation and attorneys' fees, could itself cause incalculable harm. No provider, whether an individual, non-profit corporation, or even large publicly held corporation, is likely to willingly subject itself to prosecution for a miscalculation of the prevalent community standards or for an error in judgment as to what is indecent. A successful defense to a criminal prosecution would be small solace indeed.

Credit card and adult verification services are explicitly referred to as defenses in § 223(e)(5)(B) of the CDA. As is set forth fully in the detailed Findings of Fact, these defenses are not technologically or economically feasible for most providers.

The government then falls back on the affirmative defense to prosecution provided in § 223(e)(5)(A) for a person who "has taken, in good faith, reasonable, effective, and appropriate actions under the circumstances to restrict or prevent access by minors to a communication specified in such subsections ... including any method which is feasible under available technology." The government emphasizes that "effective" does not require 100% restriction, and that this defense is "open-ended" and requires only reasonable efforts based on current technology.

But, as the evidence made clear, there is no such technology at this time. The government proffered as one option that would constitute a valid affirmative defense under § 223(e)(5)(A) a "tagging" scheme conceived by Dr. Olsen in response to this lawsuit whereby a string of characters would be imbedded in all arguably indecent or patently offensive material. Our Findings of Fact set forth fully the reasons why we found that the feasibility and effectiveness of tagging in the manner proposed by the government has not been established. All parties agree that tagging alone does nothing to prevent children from accessing potentially indecent material, because it depends upon the cooperation of third parties to block the material on which the tags are embedded. Yet these third parties, over which the content providers

have no control, are not subject to the CDA. I do not believe a statute is narrowly tailored when it subjects to potential criminal penalties those who must depend upon third parties for the effective operation of a statutory defense.

Most important, the government's "tagging" proposal is purely hypothetical and offers no currently operative defense to Internet content providers. At this time, there is no agreed-upon "tag" in existence, and no web browsers or user-based screening systems are now configured to block tagged material. Nor, significantly, has the government stipulated that a content provider could avoid liability simply by tagging its material.

Third, even if the technology catches up, as the government confidently predicts, there will still be a not insignificant burden attached to effecting a tagging defense, a burden one should not have to bear in order to transmit information protected under the constitution. For example, to effect tagging content providers must review all of their material currently published online, as well as all new material they post in the future, to determine if it could be considered "patently offensive" in any community nationwide. This would be burdensome for all providers, but for the many not-for-profit entities which currently post thousands of Web pages, this burden would be one impossible to sustain.

■ Finally, the viability of the defenses is intricately tied to the clarity of the CDA's scope. Because, like Judge Buckwalter, and for many of the reasons he gives, I believe that "indecent" and "patently offensive" are inherently vague, particularly in light of the government's inability to identify the relevant community by whose standards the material will be judged, I am not persuaded by the government that the statutory defenses in § 223(e) provide effective protection from the unconstitutional reach of the statute.

Minors would not be left without any protection from exposure to patently unsuitable material on the Internet should the challenged provisions of the CDA be preliminarily enjoined. Vigorous enforcement of current obscenity and child pornography laws should suffice to address the problem the

government identified in court and which concerned Congress. When the CDA was under consideration by Congress, the Justice Department itself communicated its view that it was not necessary because it was prosecuting online obscenity, child pornography and child solicitation under existing laws, and would continue to do so.[2] It follows that the CDA is not narrowly tailored, and the government's attempt to defend it on that ground must fail.

## G.

### Preliminary Injunction

When Congress decided that material unsuitable for minors was available on the Internet, it could have chosen to assist and support the development of technology that would enable parents, schools, and libraries to screen such material from their end. It did not do so, and thus did not follow the example available in the print media where non-obscene but indecent and patently offensive books and magazines abound. Those responsible for minors undertake the primary obligation to prevent their exposure to such material. Instead, in the CDA Congress chose to place on the speakers the obligation of screening the material that would possibly offend some communities.

Whether Congress' decision was a wise one is not at issue here. It was unquestionably a decision that placed the CDA in serious conflict with our most cherished protection—the right to choose the material to which we would have access.

The government makes what I view as an extraordinary argument in its brief. It argues that blocking technology needed for effective parental control is not yet widespread but that it "will imminently be in place." Government's Post-hearing Memorandum at 66. It then states that if we uphold the CDA, it "will likely unleash the 'creative genius' of the Internet community to find a myriad of possible solutions." I can imagine few arguments less likely to persuade a court to uphold a criminal statute than one that depends on future technology

to cabin the reach of the statute within constitutional bounds.

The government makes yet another argument that troubles me. It suggests that the concerns expressed by the plaintiffs and the questions posed by the court reflect an exaggerated supposition of how it would apply the law, and that we should, in effect, trust the Department of Justice to limit the CDA's application in a reasonable fashion that would avoid prosecution for placing on the Internet works of serious literary or artistic merit. That would require a broad trust indeed from a generation of judges not far removed from the attacks on James Joyce's *Ulysses* as obscene. *See United States v. One Book Entitled Ulysses*, 72 F.2d 705 (2d Cir.1934); *see also Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of Mass.*, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966). Even if we were to place confidence in the reasonable judgment of the representatives of the Department of Justice who appeared before us, the Department is not a monolithic structure, and individual U.S. Attorneys in the various districts of the country have or appear to exercise some independence, as reflected by the Department's tolerance of duplicative challenges in this very case.

But the bottom line is that the First Amendment should not be interpreted to require us to entrust the protection it affords to the judgment of prosecutors. Prosecutors come and go. Even federal judges are limited to life tenure. The First Amendment remains to give protection to future generations as well. I have no hesitancy in concluding that it is likely that plaintiffs will prevail on the merits of their argument that the challenged provisions of the CDA are facially invalid under both the First and Fifth Amendments.

## BUCKWALTER, District Judge:

### A.

I believe that plaintiffs should prevail in this litigation.

---

2. *See* 141 Cong.Rec. S8342 (daily ed. June 14, 1995) (letter from Kent Markus, Acting Assistant Attorney General, U.S. Department of Justice, to Senator Leahy).

My conclusion differs in part from my original memorandum filed in conjunction with the request for a Temporary Restraining Order. As part of the expedited review (per § 561 of the CDA), and in contrast to the limited documentation available to me at the time of the T.R.O. hearing, we have now gathered voluminous evidence presented by way of sworn declarations, live testimony, demonstrative evidence, and other exhibits.[1] Based upon our findings of fact derived from careful consideration of that evidence, I now conclude that this statute is overbroad and does not meet the strict scrutiny standard in *Sable Communications of California, Inc. v. FCC*, 492 U.S. 115, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989).

More specifically, I now find that current technology is inadequate to provide a safe harbor to most speakers on the Internet. On this issue, I concur in Chief Judge Sloviter's opinion. In addition, I continue to believe that the word "indecent" is unconstitutionally vague, and I find that the terms "in context"

and "patently offensive" also are so vague as to violate the First and Fifth Amendments.

■ It is, of course, correct that statutes that attempt to regulate the content of speech presumptively violate the First Amendment. *See e.g. R.A.V. v. City of Saint Paul*, 505 U.S. 377, 381, 112 S.Ct. 2538, 2541–42, 120 L.Ed.2d 305 (1992). That is as it should be. The prohibition against Government's regulation of speech cannot be set forth any clearer than in the language of the First Amendment itself. I suspect, however, that it may come as a surprise to many people who have not followed the evolution of constitutional law that, by implication at least, the First Amendment provides that Congress shall make no law abridging the freedom of speech *unless that law advances a compelling governmental interest*.[2] Our cherished freedom of speech does not cover as broad a spectrum as one may have gleaned from a simple reading of the Amendment.[3]

First Amendment jurisprudence has developed into a study of intertwining standards

---

1. If by virtue of the statute's authorization of expedited review of its constitutionality, "*on its face*," 47 U.S.C. § 561(a), we were strictly limited to looking at the words of the statute, I would stand by my T.R.O. opinion. However, in light of the procedures which are required by 47 U.S.C. § 561(a) and 28 U.S.C. § 2284, and were followed by this court in establishing an extensive record in this case, to ignore the evidence presented would be to ignore what an action for injunctive relief is all about.

   Section 561 reads as follows:
   § 561. EXPEDITED REVIEW.
   (a) THREE–JUDGE DISTRICT COURT HEARING—Notwithstanding any other provision of law, any civil action challenging the constitutionality, on its face, of this title or any amendment made by this title, or any provision thereof, shall be heard by a district court of 3 judges convened pursuant to the provisions of section 2284 of title 28, United States Code. Section 2284 states, in relevant part:
   § 2284. **Three-judge court; when required; composition; procedure**
   (b) In any action required to be heard and determined by a district court of three judges under subsection (a) of this section, the composition and procedure of the court shall be as follows: . . .
   (3) A single judge may conduct all proceedings except the trial. . . . He may grant a temporary restraining order on a specific finding, based on evidence submitted, that specified irreparable damages will result if the order is not granted, which order, unless

previously revoked by the district judge, shall remain in force only until the hearing and determination by the district court of three judges of an application for a preliminary injunction. . . .

2. Justice Kennedy argues in his opinion in *Simon & Schuster v. New York Crime Victims Bd.*, 502 U.S. 105, 120, 112 S.Ct. 501, 510–11, 116 L.Ed.2d 476 (1991), that "[t]he regulated content has the full protection of the First Amendment and this, I submit, is itself a full and sufficient reason for holding the statute unconstitutional. In my view it is both unnecessary and incorrect to ask whether the state can show that the statute 'is necessary to serve a compelling state interest and is narrowly drawn to achieve that end.'" In the present case, there is no disagreement that indecent and patently offensive speech have the full protection of the First Amendment.

3. Not only has speech been divided up and given values—with some types of speech given little or no protection (obscenity, fighting words, possibly commercial speech)—but also, by court decisions over the years, it has been decided that the content of speech can indeed be regulated provided that the regulation will directly and materially advance a compelling government interest, and that it is narrowly tailored to accomplish that interest in the least restrictive manner. However, any content-based restriction must survive this most exacting scrutiny. *Sable*, 492 U.S. 115, 109 S.Ct. 2829; *Texas v. Johnson*, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989).

and applications, perhaps as a necessary response to our ever-evolving culture and modes of communication.[4]

Essentially, my concerns are these: above all, I believe that the challenged provisions are so vague as to violate both the First and Fifth Amendments, and in particular that Congress' reliance on *Pacifica* is misplaced. In addition, I believe that technology as it currently exists—and it bears repeating that we are at the preliminary injunction phase only—cannot provide a safe harbor for most speakers on the Internet, thus rendering the statute unconstitutional under a strict scrutiny analysis. I refer to Chief Judge Sloviter's more detailed analysis of this issue.

While I believe that our findings of fact clearly show that as yet no defense is technologically feasible, and while I also have found the present Act to be unconstitutionally vague, I believe it is too early in the development of this new medium to conclude that other attempts to regulate protected speech within the medium will fail a challenge. That is to say that I specifically do not find that any and all statutory regulation of protected speech on the Internet could not survive constitutional scrutiny. Prior cases have established that government regulation to prevent access by minors to speech protected for adults, even in media considered the vanguard of our First Amendment protections, like print, may withstand a constitutional challenge. *See e.g. Ginsberg v. New York,* 390 U.S. 629, 636, 88 S.Ct. 1274, 1278, 20 L.Ed.2d 195 (1968) ("'Material which is protected for distribution to adults is not necessarily constitutionally protected from restric-

tion upon its dissemination to children.'") (quoting *Bookcase Inc. v. Broderick,* 18 N.Y.2d 71, 75, 271 N.Y.S.2d 947, 952, 218 N.E.2d 668, 671 (1966), *appeal dismissed, sub nom Bookcase, Inc. v. Leary,* 385 U.S. 12, 87 S.Ct. 81, 17 L.Ed.2d 11 (1966)). It should be noted that those restrictions that have been found constitutional were sensitive to the unique qualities of the medium at which the restriction was aimed.

## B.

This statute, all parties agree, deals with protected speech, the preservation of which has been extolled by court after court in case after case as the keystone, the bulwark, the very heart of our democracy. What is more, the CDA attempts to regulate protected speech through criminal sanctions, thus implicating not only the First but also the Fifth Amendment of our Constitution. The concept of due process is every bit as important to our form of government as is free speech. If free speech is at the heart of our democracy, then surely due process is the very lifeblood of our body politic; for without it, democracy could not survive. Distilled to its essence, due process is, of course, nothing more and nothing less than fair play. If our citizens cannot rely on fair play in their relationship with their government, the stature of our government as a shining example of democracy would be greatly diminished. I believe that an exacting or strict scrutiny of a statute which attempts to criminalize protected speech requires a word by word look at that statute to be sure that it clearly sets

---

4. The plaintiffs have made facial challenges to the disputed provisions of the CDA on grounds of both vagueness and overbreadth. The approach taken and language used in evaluating a statute under each of these doctrines commingles, and frequently is treated as a single approach. "We have traditionally viewed vagueness and overbreadth as logically related and similar doctrines." *Kolender v. Lawson,* 461 U.S. 352, 358 n. 8, 103 S.Ct. 1855, 1859 n. 8, 75 L.Ed.2d 903 (1983) (citing *Keyishian v. Board of Regents,* 385 U.S. 589, 609, 87 S.Ct. 675, 687, 17 L.Ed.2d 629 (1967); *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963)). Even in cases where the court attempts to distinguish these two doctrines, it acknowledges some interplay between them. *See e.g. Village of Hoffman*

*Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494, and n. 6, 102 S.Ct. 1186, 1191, and n. 6, 71 L.Ed.2d 362 (1982).

In addition, when discussing overbreadth, one cannot avoid reference to the same language used to describe and apply the strict scrutiny standard to constitutionally protected activities. *See e.g. Sable,* 492 U.S. at 131, 109 S.Ct. at 2839; *Roberts v. Jaycees,* 468 U.S. 609, 623, 104 S.Ct. 3244, 3252–53, 82 L.Ed.2d 462 (1984). While there are occasional attempts to argue for clear distinctions among these doctrines, *see e.g. Kolender,* 461 U.S. at 369, 103 S.Ct. at 1864–65 (White, J., Rehnquist, J. dissenting), such bright lines simply have not been, and most likely cannot be, drawn in this area.

forth as precisely as possible what constitutes a violation of the statute.

The reason for such an examination is obvious. If the Government is going to intrude upon the sacred ground of the First Amendment and tell its citizens that their exercise of protected speech could land them in jail, the law imposing such a penalty must clearly define the prohibited speech not only for the potential offender but also for the potential enforcer. *Kolender*, 461 U.S. 352, 103 S.Ct. 1855; *Hoffman Estates*, 455 U.S. 489, 102 S.Ct. 1186; *Smith v. Goguen*, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974); *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Winters v. New York*, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948).

In dealing with issues of vagueness and due process over the years, the Supreme Court has enunciated many notable principles. One concern with vague laws relates to the issue of notice. The older cases have used phrases such as "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law," *Connally v. General Const. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926) (citations omitted); "it will not do to hold an average man to the peril of indictment for the unwise exercise of his ... knowledge involving so many factors of varying effect that neither the person to decide in advance nor the jury to try him after the fact can safely and certainly judge the result," *Cline v. Frink Dairy Co.*, 274 U.S. 445, 465, 47 S.Ct. 681, 687, 71 L.Ed. 1146 (1927); and "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids," *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939). Second, the Court has said that laws must provide precise standards for those who apply them to prevent arbitrary and discriminatory enforcement, because "[w]hen the legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless

sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Kolender*, 461 U.S. at 358, 103 S.Ct. at 1858 (citing *Goguen*, 415 U.S. at 575, 94 S.Ct. at 1248). Finally, when First Amendment concerns have been implicated, a stricter standard of examination for vagueness is imperative. "[T]his court has intimated that stricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech; a man may the less be required to act at his peril here, because the free dissemination of ideas may be the loser." *Smith v. California*, 361 U.S. 147, 151, 80 S.Ct. 215, 217–18, 4 L.Ed.2d 205 (1959). *See also Hoffman Estates*, 455 U.S. at 499, 102 S.Ct. at 1193–94 ("[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech ..., a more stringent vagueness test should apply.") (citations omitted).

A case which sums up vagueness as it relates to due process as succinctly as any other is *Grayned v. City of Rockford*. Here the court said:

It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute "abut[s] upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of [those] freedoms."

Uncertain meanings inevitably lead citizens to " 'steer far wider of the unlawful zone' ... than if the boundaries of the forbidden areas were clearly marked." *Grayned,* 408 U.S. at 108–109, 92 S.Ct. at 2298–99 (citations omitted).

At the same time, in considering the vagueness issue, as the Government correctly points out, "[C]ondemned to the use of words, we can never expect mathematical certainty from our language." *Grayned,* 408 U.S. at 110, 92 S.Ct. at 2300. *See also Hoffman Estates,* 455 U.S. 489, 102 S.Ct. 1186; *Hynes v. Mayor & Council of Oradell,* 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *Goguen,* 415 U.S. 566, 94 S.Ct. 1242. In addition, it will always be true that the fertile legal "imagination can conjure hypothetical cases in which the meaning of [disputed] terms will be in nice question." *American Communications Assn. v. Douds,* 339 U.S. 382, 412, 70 S.Ct. 674, 691, 94 L.Ed. 925 (1950). Thus, as I considered the vagueness issue I have kept in mind the observation of Justice Holmes, denying a challenge to vagueness in *Nash v. United States,* 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232 (1913). To Justice Holmes, "the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment ..., he may incur the penalty of death." *Nash,* 229 U.S. at 377, 33 S.Ct. at 781. Even more recently the court has stated that "due process does not require 'impossible standards' of clarity." *Kolender,* 461 U.S. at 361, 103 S.Ct. at 1860 (quoting *United States v. Petrillo,* 332 U.S. 1, 7–8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1947)). It is with all of these principles in mind, as they interplay with the unique features of the Internet, that I have reached my conclusion.

The fundamental constitutional principle that concerns me is one of simple fairness, and that is absent in the CDA. The Government initially argues that "indecent" in this statute is the same as "patently offensive." I do not agree that a facial reading of this statute supports that conclusion. The CDA does not define the term "indecent," and the FCC has not promulgated regulations defining indecency in the medium of cyberspace. If "indecent" and "patently offensive" were intended to have the same meaning, surely section (a) could have mirrored section (d)'s language.[5] Indecent in this statute is an undefined word which, standing alone, offers no guidelines whatsoever as to its parameters. Interestingly, another federal crime gives a definition to indecent entirely different from that proposed in the present case.[6] While not applicable here, this example shows the indeterminate nature of the word and the need for clear definition, particularly in a statute which infringes upon protected speech. Although the use of different terms in § 223(a) and (d) suggests that Congress intended that the terms have different meanings, the Conference Report indicates an intention to treat § 223(a) as containing the same language as § 223(d). Conf.Rep. at 188–89 ("The conferees intend that the term indecency ... has the same meaning as established in *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) and [*Sable*] and "New section 223(d)(1) codifies the definition of indecency from [*Pacifica*].... The precise contours of the definition of indecency have varied.... The essence of the phrase—patently offensive descriptions of sexual and excretory activities—has remained constant, however."). Therefore, I will acknowledge that the term indecency is "reasonably susceptible" to the definition offered in the Conference Report

---

5. Comparing a different portion of each of these two provisions suggests that different terms are not to be read to mean the same thing. As written, section (a) pertains to telecommunications devices, and section (d) to interactive computer services. While we have not entirely resolved the tension between these definitions at this stage, it has been established that these terms are not synonymous, but are in fact intended to denote different technologies. This, together with the rule of statutory construction set forth in Chief Judge Sloviter's opinion, seems to suggest on the face of the statute that indecent and patently offensive also are not to be read as synonymous.

6. 18 U.S.C. § 1461 states, "The term 'indecent' as used in this section includes matter of a character tending to incite arson, murder or assassination."

and might therefore adopt such a narrowing construction if it would thereby preserve the constitutionality of the statute. *See Virginia v. American Booksellers Association,* 484 U.S. 383, 397, 108 S.Ct. 636, 645, 98 L.Ed.2d 782 (1988); *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975).

Accepting these terms as synonymous, however, provides no greater help to a speaker attempting to comply with the CDA. Contrary to the Government's suggestion, *Pacifica* does not answer the question of whether the terms pass constitutional muster in the present case. In *Pacifica,* the Court did not consider a vagueness challenge to the term "indecent," but considered only whether the Government had the authority to regulate the particular broadcast at issue— George Carlin's Monologue entitled "Filthy Words." In finding in the affirmative, the Court emphasized that its narrow holding applied only to broadcasting, which is "uniquely accessible to children, even those too young to read." 438 U.S. at 749, 98 S.Ct. at 3040. Thus, while the Court sanctioned the FCC's time restrictions on a radio program that repeatedly used vulgar language, the Supreme Court did not hold that use of the term "indecent" in a statute applied to other media, particularly a criminal statute, would be on safe constitutional ground.

The Supreme Court more recently had occasion to consider a statute banning "indecent" material in the dial-a-porn context in *Sable,* 492 U.S. 115, and found that a complete ban on such programming violated the First Amendment because it was not narrowly tailored to serve the purpose of limiting children's access to commercial pornographic telephone messages. Once again, the Court did not consider a challenge to the term "indecent" on vagueness grounds, and indeed has never directly ruled on this issue.

Several other courts have, however, upheld the use of the term in statutes regulating different media. For example, in *Information Providers' Coalition v. FCC,* 928 F.2d 866 (9th Cir.1991), the Ninth Circuit Court of Appeals considered whether the term "indecent" in the 1989 Amendment to the Communications Act regulating access to telephone dial-a-porn services and the FCC's implementing regulations was void for vagueness. The FCC had defined "indecent" as "the description or depiction of sexual or excretory activities or organs in a patently offensive manner as measured by contemporary community standards for the telephone medium." 928 F.2d at 874. Although recognizing that the Supreme Court had never explicitly ruled on a vagueness challenge to the term, the court read *Sable* and *Pacifica* as having implicitly accepted the use of this definition of "indecent." The court further stated that the FCC's definition of "indecent" was no less imprecise than was the definition of "obscenity" as announced in *Miller v. California,* 413 U.S. 15, 25, 93 S.Ct. 2607, 2615–16, 37 L.Ed.2d 419 (1973), and thus concluded that "indecent" as pertained to dial-a-porn regulations must survive a vagueness challenge. *See also Dial Information Services v. Thornburgh,* 938 F.2d 1535 (2d Cir.1991), (upholding the use of "indecent" in the same amendment to the Communications Act and FCC regulations.); *Action for Children's Television v. FCC,* 932 F.2d 1504, 1508 (D.C.Cir.1991) (rejecting vagueness challenge to "indecency" provision in broadcast television regulations).[7]

Notably, however, in these telephone and cable television cases the FCC had defined indecent as patently offensive by reference to contemporary community standards *for that particular medium. See, e.g., Pacifica,* 438 U.S. at 732, 98 S.Ct. at 3031–32 (defining "indecent" by reference to terms "patently offensive as measured by contemporary community standards for the broadcast medium"); *Dial Information Services,* 938 F.2d at 1540 (defining indecency by reference to contemporary community standards for the telephone medium). Here, the provision is not so limited. In fact, there is no effort to conform the restricting terms to the medium

---

7. Although the Supreme Court may rule on the vagueness question in the context of cable television regulation in *Alliance for Community Media v. FCC,* 56 F.3d 105 (D.C.Cir.1995), currently pending on *certiorari* before the Court, we will not defer adjudication of this issue as the constitutionality of the term in the cable context may not be determinative of its use in cyberspace.

of cyberspace, as is required under *Pacifica* and its progeny.

The Government attempts to save the "indecency" and "patently offensive" provisions by claiming that the provisions would only be used to prosecute pornographic works which, when considered "in context" as the statute requires, would be considered "indecent" or "patently offensive" in any community. The Government thus contends that plaintiffs' fears of prosecution for publishing material about matters of health, art, literature or civil liberties are exaggerated and unjustified. The Government's argument raises two issues: first is the question of which "community standards" apply in cyberspace, under the CDA; and second is the proposition that citizens should simply rely upon prosecutors to apply the statute constitutionally.

Are the contemporary community standards to be applied those of the vast world of cyberspace, in accordance with the Act's apparent intent to establish a uniform national standard of content regulation? The Government offered no evidence of any such national standard or nationwide consensus as to what would be considered "patently offensive". On the contrary, in supporting the use of the term "indecent" in the CDA, the Government suggests that, in part, this term was chosen as a means of insulating children from material not restricted under current obscenity laws. This additional term is necessary, the Government states, because "whether something rises to the level of obscene is a legal conclusion that, by definition, may vary from community to community." Govt.Brief at 31. In support of its argument, the Government points to the Second Circuit's decision in *United States v. Various Articles of Obscene Merchandise, Schedule No. 2102,* 709 F.2d 132, 134, 137 (2d Cir.1983), which upheld the district court's conclusion that "detailed portrayals of genitalia, sexual intercourse, fellatio, and masturbation" including the film "Deep Throat" and other pornographic films and magazines, are not obscene in light of the community standards prevailing in New York City." What this argument indicates is that as interpretations of obscenity ebb and flow throughout various communities, restrictions on indecent material are meant to cover a greater or lesser quantity of material not reached by each community's obscenity standard. It follows that to do this, what constitutes indecency must be as open to fluctuation as the obscenity standard and cannot be rigidly constructed as a single national standard if it is meant to function as the Government has suggested. As Justice Scalia stated, "[t]he more narrow the understanding of what is 'obscene,' ... the more pornographic what is embraced within the residual category of 'indecency.' " *Sable,* 492 U.S. at 132, 109 S.Ct. at 2840 (Scalia, J. concurring). This understanding is consistent with the case law, in which the Supreme Court has explained that the relevant community is the one where the information is accessed and where the local jury sits. *See Sable,* 492 U.S. at 125, 109 S.Ct. at 2836; *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *Miller,* 413 U.S. at 30, 93 S.Ct. at 2618 ("[O]ur nation is simply too big and too diverse for this Court to reasonably expect that such standards [of what is patently offensive] could be articulated for all 50 states in a single formulation."). However, the Conference Report with regard to the CDA states that the Act is "intended to establish a uniform national standard of content regulation." Conf.Rep. at 191. This conflict inevitably leaves the reader of the CDA unable to discern the relevant "community standard," and will undoubtedly cause Internet users to "steer far wider of the unlawful zone" than if the community standard to be applied were clearly defined. The chilling effect on the Internet users' exercise of free speech is obvious. *See Baggett v. Bullitt,* 377 U.S. 360, 372, 84 S.Ct. 1316, 1322–23, 12 L.Ed.2d 377 (1964). This is precisely the vice of vagueness.

In addition, the Government's argument that the challenged provisions will be applied only to "pornographic" materials, and will not be applied to works with serious value is without support in the CDA itself. Unlike in the obscenity context, indecency has *not* been defined to exclude works of serious literary, artistic, political or scientific value, and therefore the Government's suggestion that it will not be used to prosecute publishers of such material is without foundation in the law itself. The Government's claim that the

work must be considered patently offensive "in context" does nothing to clarify the provision, for it fails to explain which context is relevant. "Context" may refer to, among other things, the nature of the communication as a whole, the time of day it was conveyed, the medium used, the identity of the speaker, or whether or not it is accompanied by appropriate warnings. *See e.g., Pacifica*, 438 U.S. at 741 n. 16, n. 17, 98 S.Ct. at 3036 n. 16, n. 17 (referring to "the context of the whole book," and to the unique interpretation of the First Amendment "in the broadcasting context").

The thrust of the Government's argument is that the court should trust prosecutors to prosecute only a small segment of those speakers subject to the CDA's restrictions, and whose works would reasonably be considered "patently offensive" in *every* community. Such unfettered discretion to prosecutors, however, is precisely what due process does not allow. "It will not do to say that a prosecutor's sense of fairness and the Constitution would prevent a successful ... prosecution for some of the activities seemingly embraced within the sweeping statutory definitions. The hazard of being prosecuted ... nevertheless remains.... Well-intentioned prosecutors and judicial safeguards do not neutralize the vice of a vague law." *Baggett*, 377 U.S. at 373–74, 84 S.Ct. at 1323; *see also Keyishian v. Board of Regents*, 385 U.S. 589, 599, 87 S.Ct. 675, 681, 17 L.Ed.2d 629 (1967) ("[i]t is no answer" to a vague law for the Government "to say that the statute would not be applied in such a case."). And we cannot overlook the vagaries of politics. What may be, figuratively speaking, one administration's pen may be another's sword.

The evidence and arguments presented by the Government illustrate the possibility of arbitrary enforcement of the Act. For example, one Government expert opined that any of the so-called "seven dirty words" used in the Carlin monologue would be subject to the CDA and therefore should be "tagged," as should paintings of nudes displayed on a museum's web site. The Government has suggested in its brief, however, that the Act should not be so applied. *See* Govt.Brief at

37 (suggesting that "seven dirty words" if used "in the context of serious discussions" would not be subject to the Act). Even Government counsel was unable to define "indecency" with specificity. The Justice Department attorney could not respond to numerous questions from the court regarding whether, for example, artistic photographs of a nude man with an erect penis, depictions of Indian statues portraying different methods of copulation, or the transcript of a scene from a contemporary play about AIDS could be considered "indecent" under the Act.

Plaintiffs also argue that section 223(e)(5)(A) of the CDA, offering a defense for speakers who take "good faith, reasonable, effective and appropriate actions under the circumstances to restrict or prevent access by minors to a communication" covered by the Act, is unconstitutionally vague because it fails to specify what would constitute an effective defense to prosecution. The plain language of the safe harbor provision indicates an effort to ensure that the statute limits speech in the least restrictive means possible by taking into account emerging technologies in allowing for any and all "reasonable, effective and appropriate" approaches to·restricting minors' access to the proscribed material. But, the statute itself does not contain any description of what, other than credit card verification and adult identification codes—which we have established remain unavailable to most content providers—will protect a speaker from prosecution. Significantly, although the FCC is authorized to specify measures that might satisfy this defense, the FCC's views will not be definitive but will only "be admitted as evidence of good faith efforts" that the defendant has met the requirements of the defense. 47 U.S.C. § 223(e)(6). Thus, individuals attempting to comply with the statute presently have no clear indication of what actions will ensure that they will be insulated from criminal sanctions under the CDA.

### C.

The consequences of posting indecent content are severe.[8] I recognize that people

---

8. Each intentional act of posting indecent con-
tent for display shall be considered a separate

must make judgments each and every day, many times in the most intimate of relationships and that an error in judgment can have serious consequences. It is also true that where those consequences involve penal sanctions, a criminal law or statute has more often than not carefully defined the proscribed conduct. It is not so much that the accused needs these precise definitions, as it has been said he or she rarely reads the law in advance. What is more important is that the enforcer of statutes must be guided by clear and precise standards. In statutes that break into relatively new areas, such as this one, the need for definition of terms is greater, because even commonly understood terms may have different connotations or parameters in this new context.[9] Words cannot define conduct with mathematical certainty, and lawyers, like the bright and intelligent ones now before us, will most certainly continue to devise ways by which to challenge them. This rationale, however, can neither support a finding of constitutionality nor relieve legislators from the very difficult task of carefully drafting legislation tailored to its goal and sensitive to the unique characteristics of, in this instance, cyberspace.

DALZELL, District Judge:

## A. Introduction

I begin with first principles: As a general rule, the Constitution forbids the Government from silencing speakers because of their particular message. *R.A.V. v. City of Saint Paul*, 505 U.S. 377, 381–82, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992). "Our political system and cultural life rest upon this ideal." *Turner Broadcasting Sys. v. FCC*, — U.S. ——, ——, 114 S.Ct. 2445, 2458, 129 L.Ed.2d 497 (1994). This general rule is subject only to "narrow and well-understood exceptions". *Id.* A law that, as here, regulates speech on the basis of its content, is "presumptively invalid". *R.A.V.*, 505 U.S. at 381–82, 112 S.Ct. at 2542.

Two of the exceptions to this general rule deal with obscenity (commonly understood to include so-called hardcore pornography), *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), and child pornography, *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). The Government can and does punish with criminal sanction people who engage in these forms of speech. 18 U.S.C. §§ 1464–65 (criminalizing obscene material); *id.* §§ 2251–52 (criminalizing child pornography). Indeed, the Government could punish these forms of speech on the Internet even without the CDA. *E.g., United States v. Thomas*, 74 F.3d 701, 704–05 (6th Cir.1995) (affirming obscenity convictions for the operation of a computer bulletin board).

The Government could also completely ban obscenity and child pornography from the Internet. No Internet speaker has a right to engage in these forms of speech, and no Internet listener has a right to receive them. Child pornography and obscenity have "no constitutional protection, and the government may ban [them] outright in certain media, or in all." *Alliance for Community Media v. FCC*, 56 F.3d 105, 112 (D.C.Cir.1995) (citing *R.A.V.*, 505 U.S. at 386–88, 112 S.Ct. at 2545), *cert. granted sub nom. Denver Area Educ. Telecommunications Consortium v. FCC*, — U.S. ——, 116 S.Ct. 471, 133 L.Ed.2d 401 (1996); *see also Ferber*, 458 U.S. at 756, 102 S.Ct. at 3354. As *R.A.V.* notes, " 'the freedom of speech' referred to by the First Amendment does not include a freedom to disregard these traditional limitations." *R.A.V.*, 505 U.S. at 383, 112 S.Ct. at 2543.

The cases before us, however, are *not* about obscenity or child pornography. Plaintiffs in these actions claim no right to engage in these forms of speech in the future, nor does the Government intimate that plaintiffs have engaged in these forms of speech in the past.

---

violation of this subsection and carries with it a fine, a prison term of up to two years, or both. 47 U.S.C. § 223(a), (d) and Conf.Rep. at 189.

**9.** As I have noted, the unique nature of the medium cannot be overemphasized in discussing and determining the vagueness issue. This is not to suggest that new technology should drive consti-

tutional law. To the contrary, I remain of the belief that our fundamental constitutional principles can accommodate any technological achievements, even those which, *presently* seem to many to be in the nature of a miracle such as the Internet.

This case is about "indecency", as that word has come to be understood since the Supreme Court's decisions in *FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), and *Sable Communications v. FCC*, 492 U.S. 115, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989). The legal difficulties in these actions arise because of the special place that indecency occupies in the Supreme Court's First Amendment jurisprudence. While adults have a First Amendment right to engage in indecent speech, *Sable*, 492 U.S. at 126, 109 S.Ct. at 2836–37; *see also Pacifica*, 438 U.S. at 747–48, 98 S.Ct. at 3039–40, the Supreme Court has also held that the Government may, consistent with the Constitution, regulate indecency on radio and television, and in the "dial-a-porn" context, as long as the regulation does not operate as a complete ban. Thus, any regulation of indecency in these areas must give adults access to indecent speech, which is their right.

The Government may only regulate indecent speech for a compelling reason, and in the least restrictive manner. *Sable*, 492 U.S. at 126, 109 S.Ct. at 2836–37. "It is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends." *Id.* This "most exacting scrutiny", *Turner*, — U.S. at —, 114 S.Ct. at 2459, requires the Government to "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *United States v. National Treasury Employees Union*, — U.S. —, —, 115 S.Ct. 1003, 1017, 130 L.Ed.2d 964 (1995) (citing *Turner*, — U.S. at —, 114 S.Ct. at 2450). Thus, although our analysis here must balance ends and means, the scales tip at the outset in plaintiffs' favor. This is so because "[r]egulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Simon & Schuster, Inc. v. Members of the New York State Crime Victims Board*, 502 U.S. 105, 116, 112 S.Ct. 501, 508, 116 L.Ed.2d 476 (1991) (citation omitted).

The Government argues that this case is really about pornography on the Internet. Apart from hardcore and child pornography,

however, the word *pornography* does not have a fixed legal meaning. When I use the word *pornography* in my analysis below, I refer to for-profit purveyors of sexually explicit, "adult" material similar to that at issue in *Sable*. *See* 492 U.S. at 118, 109 S.Ct. at 2832. Pornography is normally either obscene or indecent, as Justice Scalia noted in his concurrence in *Sable*. *Id.* at 132, 109 S.Ct. at 2839–40. I would avoid using such an imprecise (and overbroad) word, but I feel compelled to do so here, since Congress undoubtedly had such material in mind when it passed the CDA. *See* S.Rep. No. 230, 104th Cong., 2d Sess. 187–91 (1996), *reprinted in* 1996 U.S.C.C.A.N. 10, 200–05 [hereinafter *Senate Report*]. Moreover, the Government has defended the Act before this court by arguing that the Act could be constitutionally applied to such material.

Plaintiffs have, as noted, moved for a preliminary injunction. The standards for such relief are well-settled. Plaintiffs seeking preliminary injunctive relief must show (1) "[a] reasonable probability of eventual success in the litigation" and (2) "irreparabl[e] injur[y] *pendente lite*" if relief is not granted. *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir.1994). We must also consider, if appropriate, (3) "the possibility of harm to other interested persons from the grant or denial of the injunction", and (4) "the public interest". *Id.*; *see also Opticians Ass'n v. Independent Opticians*, 920 F.2d 187, 192 (3d Cir.1990).

In a First Amendment challenge, a plaintiff who meets the first prong of the test for a preliminary injunction will almost certainly meet the second, since irreparable injury normally arises out of the deprivation of speech rights, "for even minimal periods of time". *Elrod v. Burns*, 427 U.S. 347, 373–74, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976); *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir.), *cert. denied*, 493 U.S. 848, 110 S.Ct. 144, 107 L.Ed.2d 102 (1989). Of course, neither the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law. Thus, I focus my legal analysis today primarily on whether plaintiffs have shown a likelihood of success on their claim that the CDA is unconstitu-

tional. The issues of irreparable harm to plaintiffs, harm to third parties, and the public interest all flow from that determination.[1]

Plaintiffs' challenge here is a "facial" one. A law that regulates the content of speech is facially invalid if it does not pass the "most exacting scrutiny" that we have described above, or if it would "penalize a substantial amount of speech that is constitutionally protected". *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129–30, 112 S.Ct. 2395, 2401, 120 L.Ed.2d 101 (1992). This is so even if some applications would be "constitutionally unobjectionable". *Id.; see also National Treasury Employees Union v. United States*, 990 F.2d 1271, 1279–80 (D.C.Cir.1993) (Randolph, J., concurring), *aff'd*, —— U.S. ——, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995). Sometimes facial challenges require an inquiry into a party's "standing" (*i.e.*, whether a party may properly challenge a law as facially invalid). *See, e.g., Ferber*, 458 U.S. at 767–79, 102 S.Ct. at 3359–67. At other times a facial challenge requires only an inquiry into the law's reach. *See, e.g., R.A.V.*, 505 U.S. at 390–91, 112 S.Ct. at 2547.[2] As I describe it in part C below, I have no question that plaintiffs here have standing to challenge the validity of the CDA, and, indeed, the Government has not seriously challenged plaintiffs' standing to do so. *See, e.g., Virginia v. American Booksel-*

*lers Assoc.*, 484 U.S. 383, 392, 108 S.Ct. 636, 642–43, 98 L.Ed.2d 782 (1988). Thus, the focus is squarely on the merits of plaintiffs' facial challenge.[3]

I divide my legal analysis below into three parts. In Part B, I examine the traditional definition of indecency and relate it to the provisions of the CDA at issue in this action. From this analysis I conclude that § 223(a) and § 223(d) of the CDA reach the same kind of speech. My analysis also convinces me that plaintiffs are unlikely to succeed in their claim that the CDA is unconstitutionally vague. In Part C, I address the Government's argument that plaintiffs are not the CDA's target, nor would they likely face prosecution under the Act. Here, I conclude that plaintiffs could reasonably fear prosecution under the Act, even if some of their fears border on the farfetched. In Part D, I consider the legal implications of the special attributes of Internet communication, as well as the effect that the CDA would have on these attributes. In this Part I conclude that the disruptive effect of the CDA on Internet communication, as well as the CDA's broad reach into protected speech, not only render the Act unconstitutional but also would render unconstitutional any regulation of protected speech on this new medium.

1. By Order dated March 13, 1996, we asked the parties to submit their views on questions regarding allocation of the burdens of proof in these cases. Since I believe that the outcome of these cases is clear regardless of the allocation of proof between the parties, none of my conclusions in this opinion requires me to choose between the arguments that the parties have presented to us.

2. Although I do not believe the statute is unconstitutionally vague, I agree with Judge Buckwalter that the Government's promise that it cannot enforce the plain reach of the law cannot salvage its overbreadth. Even accepting the Government's argument that prosecution of non-obscene pornography would be a "legitimate application" of the CDA, *City of Houston v. Hill*, 482 U.S. 451, 459, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398 (1987), it is clear that the Act would "make unlawful a substantial amount of constitutionally protected conduct", *id.* As in *Hill*, the Government's circular reasoning—that the law is constitutional because prosecutors would only apply it to those against whom it could constitutionally

be applied—must fail. *See id.* at 464–67, 107 S.Ct. at 2511–13.

3. Plaintiffs have argued that we may consider their challenge under the standards governing both "facial" and "as-applied" challenges. That is, they suggest that we may pass judgment on the decency of the plaintiffs' speech, even if we are unable to conclude that the act is facially unconstitutional. Surely this procedural confusion arises out of the three opinions of the D.C. Circuit in *National Treasury Employees Union v. United States*, 990 F.2d 1271, 1279–80 (D.C.Cir. 1993), *aff'd*, —— U.S. ——, 115 S.Ct. 1003, 130 L.Ed.2d 964.

I doubt that we could undertake an as-applied inquiry, since we do not know the exact content of plaintiffs' speech. Indeed, it is impossible to know the exact content of some plaintiffs' speech, since plaintiffs themselves cannot know that content. America Online, for example, cannot know what its subscribers will spontaneously say in chat rooms or post to bulletin boards. In any event, I need not address this issue, in the light of our disposition today.

## B. Defining Indecency

Although no court of appeals has ever to my knowledge upheld a vagueness challenge to the meaning of "indecency", several recent cases have grappled with the elusive meaning of that word in the context of cable television and "dial-a-porn". *Alliance for Community Media v. FCC*, 56 F.3d 105 (D.C.Cir.1995), *cert. granted*, —— U.S. ——, 116 S.Ct. 471, 133 L.Ed.2d 401 (1996); *Dial Information Serv. Corp. v. Thornburgh*, 938 F.2d 1535 (2d Cir.1991), *cert. denied*, 502 U.S. 1072, 112 S.Ct. 966, 117 L.Ed.2d 132 (1992); *Information Providers' Coalition for Defense of the First Amendment v. FCC*, 928 F.2d 866 (9th Cir.1991).

In *Alliance for Community Media*, 56 F.3d at 123–25, for example, the District of Columbia Court of Appeals addressed prohibitions on indecent programming on certain cable television channels. That court noted that the FCC has codified the meaning of " 'indecent' programming" on cable television as "programming that describes or depicts sexual or excretory activities or organs in a patently offensive manner as measured by contemporary community standards for the cable medium." *Id.* at 112 (citing what is now 47 C.F.R. § 76.701(g)).

The FCC took a similar approach to the definition of "indecency" in the "dial-a-porn" medium.[4] In *Dial Information Services*, 938 F.2d at 1540, the Second Circuit quoted the FCC's definition of indecent telephone communications in that context:

> [I]n the dial-a-porn context, we believe it is appropriate to define indecency as the description or depiction of sexual or excretory activities or organs in a patently offensive manner as measured by contemporary community standards for the telephone medium.

*Id.* at 1540 (citation omitted); *see also Information Providers' Coalition for Defense of the First Amendment v. FCC*, 928 F.2d 866, 876 (9th Cir.1991).

These three cases recognize that the FCC did not define "indecency" for cable and dial-a-porn in a vacuum. Rather, it borrowed from the Supreme Court's decision in *FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). In that case (which I describe in greater detail below), the Supreme Court established the rough outline from which the FCC fashioned its three-part definition. For the first two parts of the test, the Supreme Court emphasized the "importance of context" in examining arguably indecent material. *Id.* at 747 n. 25, 98 S.Ct. at 3039 n. 25. "Context" in the *Pacifica* opinion includes consideration of both the particular *medium* from which the material originates and the particular *community* that receives the material. *Id.* at 746, 98 S.Ct. at 3038–39 (assuming that the Carlin monologue "would be protected in other contexts"); *id.* at 748–51, 98 S.Ct. at 3039–41 (discussing the attributes of broadcast); *see also Information Providers' Coalition*, 928 F.2d at 876 (discussing the "content/context dichotomy"). Second, the opinion limits its discussion to "patently offensive sexual and excretory language", *Pacifica*, 438 U.S. at 747, 98 S.Ct. at 3039, and this type of content has remained the FCC's touchstone. *See, e.g., Alliance for Community Media*, 56 F.3d at 112.[5]

We have quoted from the CDA extensively above and I will only briefly rehearse that discussion here. Section 223(a) of the CDA criminalizes "indecent" speech on the Internet. This is the "indecency" provision. Section 223(d) of the CDA addresses speech that, "in context, depicts or describes, in terms patently offensive as measured by contemporary community standards, sexual or excretory activities or organs". This is the "patently offensive" provision. The foregoing discussion leads me to conclude that these two provisions describe the same kind of speech. That is, the use of "indecent" in § 223(a) is shorthand for the longer description in § 223(d). Conversely, the longer description in § 223(d) is itself the definition of "indecent" speech. I believe Congress could

---

4. "Dial-a-porn" is a shorthand description of "sexually oriented prerecorded telephone messages". *Sable*, 492 U.S. at 117–18, 109 S.Ct. at 2832.

5. In turn, *Pacifica*'s definition of indecency has its roots in the Supreme Court's obscenity jurisprudence. Indecency includes some but not all of the elements of obscenity. *See, e.g., Alliance for Community Media*, 56 F.3d at 113–14 n. 4.

have used the word "indecent" in both § 223(a) and § 223(d), or it could have used the "patently offensive" description of § 223(d) in § 223(a), without a change in the meaning of the Act. I do not believe that Congress intended that this distinction alone would change the reach of either section of the CDA.[6]

The CDA's legislative history confirms this conclusion. There, the conference committee explicitly noted that § 223(d) "codifies the definition of indecency from *FCC v. Pacifica Foundation,* 438 U.S. 726 [98 S.Ct. 3026, 57 L.Ed.2d 1073] (1978).... The conferees intend that the term indecency (and the rendition of the definition of that term in new section 502) has the same meaning as established in *FCC v. Pacifica Foundation,* 438 U.S. 726 [98 S.Ct. 3026, 57 L.Ed.2d 1073] (1978) and *Sable Communications of California, Inc. v. FCC,* 492 U.S. 115 [109 S.Ct. 2829, 106 L.Ed.2d 93] (1989)." *Senate Report* at 188, *reprinted in* 1996 U.S.C.C.A.N. at 201–02. The legislative history makes clear that Congress did not intend to create a distinction in meaning when it used the generic term "indecency" in § 223(a) and the definition of that term in § 223(d).[7]

There is no doubt that the CDA requires the most stringent review for vagueness, since it is a criminal statute that "threatens to inhibit the exercise of constitutionally protected rights". *Colautti v. Franklin,* 439 U.S. 379, 391, 99 S.Ct. 675, 683, 58 L.Ed.2d 596 (1979); *see also Kolender v. Lawson,* 461 U.S. 352, 358 n. 8, 103 S.Ct. 1855, 1859 n. 8, 75 L.Ed.2d 903 (1983); *Grayned,* 408 U.S. at 108–09, 92 S.Ct. at 2298–99. My analysis here nevertheless leads ineluctably to the conclusion that the definition of indecency is not unconstitutionally vague. The *Miller* definition of obscenity has survived such challenges, *see, e.g., Hamling v. United States,* 418 U.S. 87, 118–19, 94 S.Ct. 2887,

2908–09, 41 L.Ed.2d 590 (1974); *Fort Wayne Books, Inc. v. Indiana,* 489 U.S. 46, 57, 109 S.Ct. 916, 924, 103 L.Ed.2d 34 (1989), and the definition of indecency contains a subset of the elements of obscenity. If the *Miller* test "give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly", *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972), the omission of parts of that test does not warrant a contrary conclusion. *See Dial Information Services,* 938 F.2d at 1541–42. Similarly, since the definition of indecency arose from the Supreme Court itself in *Pacifica,* we may fairly imply that the Court did not believe its own interpretation to invite "arbitrary and discriminatory enforcement" or "abut upon sensitive areas of basic First Amendment freedoms". *Grayned,* 408 U.S. at 108–109, 92 S.Ct. at 2299 (citations and alterations omitted). *Sable,* while not explicitly addressing the issue of vagueness, reinforces this conclusion. *See Information Providers' Coalition,* 928 F.2d at 875–76 (citing *Sable,* 492 U.S. at 126–27, 109 S.Ct. at 2836–37). It follows, then, that plaintiffs' vagueness challenge is not likely to succeed on the merits and does not support preliminary injunctive relief.

The possible interpretations of the defenses in § 223(e) do not alter this conclusion. As a matter of statutory construction, § 223(e)(5)(B) could not be clearer. This section, which imports the dial-a-porn defenses into the CDA, creates "specific and objective" methods to avoid liability. *See Roberts v. United States Jaycees,* 468 U.S. 609, 629, 104 S.Ct. 3244, 3255–56, 82 L.Ed.2d 462 (1984). Section 223(e)(5)(A) is more suspect, since it arguably "fail[s] to describe with sufficient particularity what a suspect must do in order to satisfy" it. *Kolender* 461 U.S.

---

6. The reach of the two provisions is not coterminous, however. As we explain in the introduction to this Adjudication, § 223(a) reaches the making, creation, transmission, and initiation of indecent speech. Section 223(d) arguably reaches more broadly to the "display" of indecent speech. I conclude here only that both sections refer to the identical type of proscribed speech.

7. At oral argument, counsel for the Government candidly recognized that "there's nothing quite like this statute before", and that the CDA's novelty raised some "legislative craftsmanship problem[s]". Transcript of May 10, 1996, at 81–82. I believe that my analysis here makes sense in the light of the legislative history and the jurisprudence on which Congress relied in enacting the CDA. *See* Senate Report at 188, *reprinted in* 1996 U.S.C.C.A.N. at 201–02.

at 361, 103 S.Ct. at 1860.[8] Yet even though the defenses in both sections are unavailable to many Internet users, their unavailability does not render the *liability* provisions vague. Rather, their unavailability just transforms § 223(a) and § 223(d) into a total ban, in violation of *Butler v. Michigan*, 352 U.S. 380, 383, 77 S.Ct. 524, 525–26, 1 L.Ed.2d 412 (1957), and *Sable*, 492 U.S. at 127, 131, 109 S.Ct. at 2837, 2839. I am sensitive to plaintiffs' arguments that the statute, as written, does not create safe harbors through which all Internet users may shield themselves from liability. Transcript of May 10, 1996, at 37–38. Here again, however, the absence of safe harbors relates to the (over)breadth of a statute, and not its vagueness. *See Sable*, 492 U.S. at 127, 131, 109 S.Ct. at 2837, 2839.

## C. Plaintiffs' Likelihood of Prosecution Under the Act

The Government has consistently argued that the speech of many of the plaintiffs here is almost certainly not indecent. They point, for example, to the educational and political content of plaintiffs' speech, and they also suggest that the occasional curse word in a card catalogue will probably not result in prosecution. *See Senate Report* at 189, *reprinted in* 1996 U.S.C.C.A.N. at 203 ("Material with serious redeeming value is quite obviously intended to edify and educate, not to offend."). In this section I address that argument.

I agree with the Government that some of plaintiffs' claims are somewhat exaggerated, but hyperbolic claims do not in themselves weigh in the Government's favor. In recent First Amendment challenges, the Supreme Court has itself paid close attention to extreme applications of content-based laws.

In *Simon & Schuster, Inc. v. Members of the New York State Crime Victims Board*, 502 U.S. 105, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991), the Court addressed the constitutionality of a law that required criminals to turn over to their victims any income derived from books, movies, or other commercial exploitation of their crimes. *Id.* at 109, 112 S.Ct. at 504–05. In its opinion, the Court evaluated the argument of an *amicus curiae* that the law's reach could include books such as *The Autobiography of Malcolm X*, *Civil Disobedience*, and *Confessions of Saint Augustine*, and authors such as Emma Goldman, Martin Luther King, Jr., Sir Walter Raleigh, Jesse Jackson, and Bertrand Russell. *Id.* at 121–22, 112 S.Ct. at 511. The Court credited the argument even while recognizing that it was laced with "hyperbole":

> The argument that [the] statute . . . would prevent publication of all of these works is hyperbole—some would have been written without compensation—but the . . . law clearly reaches a wide range of literature that does not enable a criminal to profit from his crime while a victim remains uncompensated.

*Id.* at 122, 112 S.Ct. at 511. If a content-based law "*can* produce such an outcome", *id.* at 123, 112 S.Ct. at 512 (emphasis added), then *Simon & Schuster* allows us to consider those outcomes in our analysis.

Even more recently, in *United States v. National Treasury Employees Union*, —— U.S. ——, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995), the Court addressed the constitutionality of a law that banned federal employees from accepting honoraria for publications unrelated to their work. *Id.* at ——, 115 S.Ct. at 1008. The Court noted that the law would reach "literary giants like Nathaniel Hawthorne and Herman Melville, . . . Walt Whitman, . . . and Bret Harte". *Id.* at ——, 115 S.Ct. at 1012. This concern resurfaced later in the opinion, *see id.* at ——, 115 S.Ct. at 1015 ("[W]e cannot ignore the risk that [the ban] might deprive us of the work of a future Melville or Hawthorne."), even though a footnote immediately renders this concern at least hyperbolic:

> These authors' familiar masterworks would survive the honoraria ban as currently ad-

---

8. The counterargument is that § 223(e)(5)(A), when read together with § 223(e)(6), merely confers jurisdiction on the FCC to prescribe the "reasonable, effective, and appropriate actions" that count as defenses. Congress employed a similar scheme for dial-a-porn. *See Dial Information Servs.*, 938 F.2d at 1539 (citing 47 U.S.C. § 223(b)(3)); *Information Providers' Coalition*, 928 F.2d at 871.

ministered. Besides exempting all books, the [regulations implementing the ban] protect fiction and poetry from the ban's coverage, although the statute's language is not so clear. But some great artists deal in fact as well as fiction, and some deal in both.

*Id.* n. 16 (citations omitted).

Here, even though it is perhaps unlikely that the Carnegie Library will ever stand in the dock for putting its card catalogue online, or that the Government will hale the ACLU into court for its online quiz of the seven dirty words, we cannot ignore that the Act could reach these activities. The definition of indecency, like the definition of obscenity, is not a rigid formula. Rather, it confers a large degree of autonomy to individual communities to set the bounds for decency for themselves. *Cf. Sable,* 492 U.S. at 125–26, 109 S.Ct. at 2836–37. This is as it should be, since this flexibility recognizes that ours is a country with diverse cultural and historical roots. *See, e.g., Hamling,* 418 U.S. at 104–05, 94 S.Ct. at 2901 ("A juror is entitled to draw on his own knowledge of the views of the average person in the community or vicinage from which he comes for making the required determination, just as he is entitled to draw on his knowledge of the propensities of a 'reasonable' person in other areas of the law.").

Putting aside hyperbolic application, I also have little doubt that some communities could well consider plaintiffs' speech indecent, and these plaintiffs could—perhaps should—have a legitimate fear of prosecution. In *Action for Children's Television v. FCC,* 58 F.3d 654 (D.C.Cir.1995), the District of Columbia Court of Appeals summarized three broadcasts that the FCC found indecent in the late 1980s:

> The offending morning broadcast ... contained "explicit references to masturbation, ejaculation, breast size, penis size, sexual intercourse, nudity, urination, oral-genital contact, erections, sodomy, bestiality, menstruation and testicles." The remaining two were similarly objectionable.

*Id.* at 657 (citing *In re Infinity Broadcasting Corp.,* 3 FCC R. 930, 932 (1987)). In *Infinity Broadcasting,* one of the broadcasts that the FCC found indecent was an excerpt of a play about AIDS, finding that the excerpts "contained the concentrated and repeated use of vulgar and shocking language to portray graphic and lewd depictions of excretion, anal intercourse, ejaculation, masturbation, and oral-genital sex". 3 FCC R. at 934.[9] To the FCC, even broadcasts with "public value ... addressing the serious problems posed by AIDS" can be indecent if "that material is presented in a *manner* that is patently offensive". *Id.* (emphasis in original).[10]

Yet, this is precisely the kind of speech that occurs, for example, on Critical Path AIDS Project's Web site, which includes safer sex instructions written in street language for easy comprehension. The Web site also describes the risk of HIV transmission for particular sexual practices. The FCC's implication in *In the Matter of King Broadcasting Co.,* 5 FCC R. 2971 (1990), that a "candid discussion[ ] of sexual topics" on television was decent in part because it was "not presented in a pandering, titillating or vulgar manner" would be unavailing to Critical Path, other plaintiffs, and some *amici.* These organizations *want* to pander and titillate on their Web sites, at least to a degree, to attract a teen audience and deliver their message in an engaging and coherent way.[11]

---

9. The play was "critically acclaimed and long-running in Los Angeles area theaters". *Infinity Broadcasting,* 3 FCC R. at 932.

10. Analytically, it makes sense that indecent speech has public value. After all, indecent speech is nevertheless *protected* speech, *see, e.g., Sable,* 492 U.S. at 126, 109 S.Ct. at 2836–37, and it must therefore have some public value that underlies the need for protection. Obscenity, by contrast, has no public value, *id.* at 124, and thus has no protection from proscription.

11. Internet technology undercuts the Government's argument that the "in context" element of §§ 223(a) and 223(d) would insulate plaintiffs such as Critical Path from liability. *See, e.g.,* Transcript of May 10, 1996, at 89–91. A user who clicks on a link in the Critical Path database (*see* Findings 33, 77–78) might travel to a highly graphic page in a larger HTML document. The social value of that page, in context, might be debatable, but the use of links effectively excerpts that document by eliminating content unrelated to the link.

In *In re letter to Merrell Hansen*, 6 FCC R. 3689 (1990), the FCC found indecent a morning discussion between two announcers regarding Jim Bakker's alleged rape of Jessica Hahn. *Id.* Here, too, the FCC recognized that the broadcast had public value. *Id.* (noting that the broadcast concerned "an incident that was at the time 'in the news' "). Yet, under the FCC's interpretation of *Pacifica*, "the merit of a work is 'simply one of the many variables' that make up a work's context". *Id.* (citation omitted).

One of the plaintiffs here, Stop Prisoner Rape, Inc., has as its core purpose the issue of prison rape. The organization creates chat rooms in which members can discuss their experiences. Some *amici* have also organized Web sites dedicated to survivors of rape, incest, and other sexual abuse. These Web sites provide fora for the discussion and contemplation of shared experiences. The operators of these sites, and their participants, could legitimately fear prosecution under the CDA.

With respect to vulgarity, the Government is in a similarly weak position. In *Pacifica*, the Supreme Court held that multiple repetition of expletives could be indecent. *Pacifica*, 438 U.S. at 750, 98 S.Ct. at 3040–41. Although the FCC did not follow this rationale with respect to a broadcast of "a *bona fide* news story" on National Public Radio, *Letter to Mr. Peter Branton*, 6 FCC R. 610 (1991), *aff'd on other grounds sub nom. Branton v. FCC*, 993 F.2d 906, 908 (D.C.Cir. 1993), the ACLU, a plaintiff here, could take little comfort from that administrative decision. It would need to discern, for example, whether a chat room that it organized to discuss the meaning of the word *fuck* was more like the Carlin monologue or more like a National Public Radio broadcast.[12] The Government's expert would have found expletives indecent in a community consisting only of himself,[13] and his views undoubtedly—and reasonably—reflect the view of many people.

In sum, I am less confident than the Government that societal mores have changed so drastically since *Pacifica* that an online equivalent of the Carlin monologue, or the Carlin monologue itself online, would pass muster under the CDA. Under existing precedent, plaintiffs' fear of prosecution under the Act is legitimate, even though they are not the pornographers Congress had in mind when it passed the CDA.[14] *Cf. City of Houston v. Hill*, 482 U.S. 451, 459, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398 (1987). My discussion of the effect and reach of the CDA, therefore, applies both to plaintiffs' hyperbolic concerns and to their very real ones.

## D. A Medium–Specific Analysis

The Internet is a new medium of mass communication.[15] As such, the Supreme Court's First Amendment jurisprudence compels us to consider the special qualities of this new medium in determining whether the CDA is a constitutional exercise of governmental power. Relying on these special qualities, which we have described at length in our Findings of fact above, I conclude that the CDA is unconstitutional and that the First Amendment denies Congress the power to regulate protected speech on the Internet. This analysis and conclusions are consistent with Congress's intent to avoid tortuous and piecemeal review of the CDA by authorizing expedited, direct review in the Supreme Court "as a matter of right" of interlocutory, and not merely final, orders upholding facial

12. Moreover, because of the technology of Internet relay chat, it would need to make this determination *before* it organized the chat room, since it could not pre-screen the discussion among the participants. Thus, it would need to predict, in advance, what the participants were likely to say. The participants would need to make a similar determination, unaided (I expect) by First Amendment lawyers.

13. Testimony of April 12, 1996, at 235–36.

14. In this section I do not imply that the FCC has jurisdiction to process Internet complaints in the same manner as it does for broadcast. The extent of the FCC's jurisdiction under the CDA is a sticky question not relevant here. *See Senate Report* at 190–91, *reprinted in* 1996 U.S.C.C.A.N. at 204. Because the administrative decisions cited above arose out of citizens' complaints to the FCC, however, they provide a kind of surrogate insight into the kinds of speech that citizens have charged as indecent in the past.

15. *See* Finding of fact 81. *See also* Symposium, *Emerging Media: Technology and the First Amendment*, 104 Yale L.J. 1613 (1995).

challenges to the Act. *See* § 561(b) of the Telecommunications Act of 1996.[16]

## 1. The Differential Treatment of Mass Communication Media

Nearly fifty years ago, Justice Jackson recognized that "[t]he moving picture screen, the radio, the newspaper, the handbill, the sound truck and the street corner orator have differing natures, values, abuses and dangers. Each ... is a law unto itself". *Kovacs v. Cooper*, 336 U.S. 77, 97, 69 S.Ct. 448, 459, 93 L.Ed. 513 (1949) (Jackson, J., concurring). The Supreme Court has expressed this sentiment time and again since that date, and differential treatment of the mass media has become established First Amendment doctrine. *See, e.g., Turner Broadcasting Sys., Inc. v. FCC,* — U.S. —, —, 114 S.Ct. 2445, 2456, 129 L.Ed.2d 497 (1994) ("It is true that our cases have permitted more intrusive regulation of broadcast speakers than of speakers in other media."); *Pacifica*, 438 U.S. at 748, 98 S.Ct. at 3039 ("We have long recognized that each medium of expression presents special First Amendment problems."); *City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 496, 106 S.Ct. 2034, 2039, 90 L.Ed.2d 480 (1986) ("Different communications media are treated differently for First Amendment purposes.") (Blackmun, J., concurring); *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 500–01, 101 S.Ct. 2882, 2889, 69 L.Ed.2d 800 (1981) (plurality opinion) ("This Court has often faced the problem of applying the broad principles of the First Amendment to unique forums of expression."). Thus, the Supreme Court has established different rules for print, *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), broadcast radio and television, *see, e.g., Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), cable television, *Turner*, — U.S. at — – —, 114 S.Ct. at 2456–57, and even billboards, *Me-*tromedia, 453 U.S. at 501, 101 S.Ct. at 2889, and drive-in movie theaters, *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975).

This medium-specific approach to mass communication examines the underlying technology of the communication to find the proper fit between First Amendment values and competing interests. In print media, for example, the proper fit generally forbids governmental regulation of content, however minimal. *Tornillo*, 418 U.S. at 258, 94 S.Ct. at 2839–40. In other media (billboards, for example), the proper fit may allow for some regulation of both content and of the underlying technology (such as it is) of the communication. *Metromedia*, 453 U.S. at 502, 101 S.Ct. at 2889–90.

Radio and television broadcasting present the most expansive approach to medium-specific regulation of mass communication. As a result of the scarcity of band widths on the electromagnetic spectrum, the Government holds broad authority both to parcel out the frequencies and to prohibit others from speaking on the same frequency:

> As a general matter, there are more would-be broadcasters than frequencies available in the electromagnetic spectrum. And if two broadcasters were to attempt to transmit over the same frequency in the same locale, they would interfere with one another's signals, so that neither could be heard at all. The scarcity of broadcast frequencies thus required the establishment of some regulatory mechanism to divide the electromagnetic spectrum and assign specific frequencies to particular broadcasters.

*Turner,* — U.S. at —, 114 S.Ct. at 2456 (citing *FCC v. League of Women Voters*, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984)).

---

**16.** A narrow holding for this new medium also will not eliminate the chill to plaintiffs, who could well stifle the extent of their participation in this new medium while awaiting a future iteration of the CDA. Such a holding would also lead Congress to believe that a rewritten CDA (using, for example, a "harmful to minors" stan-dard, *see* Senate Report at 189, *reprinted in* 1996 U.S.C.C.A.N. at 202) would pass constitutional muster. In my view, a holding consistent with the novel qualities of this medium provides Congress with prompt and clear answers to the questions that the CDA asks.

This scarcity also allows the Government to regulate content even after it assigns a license:

> In addition, the inherent physical limitation on the number of speakers who may use the broadcast medium has been thought to require some adjustment in traditional First Amendment analysis to permit the Government to place limited content restraints, and impose certain affirmative obligations, on broadcast licensees.

*Id.* at ——, 114 S.Ct. at 2457 (citing *Red Lion,* 395 U.S. at 390–95, 89 S.Ct. at 1806–09; *National Broadcasting Co. v. United States,* 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943)).

The broadcasting cases firmly establish that the Government may force a licensee to offer content to the public that the licensee would otherwise not offer, thereby assuring that radio and television audiences have a diversity of content. In broadcasting, "[i]t is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial". *Red Lion,* 395 U.S. at 390, 89 S.Ct. at 1807; *see also CBS, Inc. v. FCC,* 453 U.S. 367, 395, 101 S.Ct. 2813, 2829, 69 L.Ed.2d 706 (1981) ("A licensed broadcaster is 'granted the free and exclusive use of a limited and valuable part of the public domain; when he accepts that franchise it is burdened by enforceable public obligations.'") (citation omitted); *Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm.,* 412 U.S. 94, 110–11, 93 S.Ct. 2080, 2090–91, 36 L.Ed.2d 772 (1973). These content restrictions include punishing licensees who broadcast inappropriate but protected speech at an impermissible time. *Pacifica,* 438 U.S. at 750–51, 98 S.Ct. at 3040–41.

In this case, the Government relies on the *Pacifica* decision in arguing that the CDA is a constitutional exercise of governmental power. Since the CDA regulates indecent speech, and since *Pacifica* authorizes governmental regulation of indecent speech (so the Government's argument goes), it must follow that the CDA is a valid exercise of governmental power. That argument, however, ignores *Pacifica*'s roots as a decision addressing the proper fit between broadcasting and the First Amendment. The argument also assumes that what is good for broadcasting is good for the Internet.

### 2. The Scope of the *Pacifica* Decision

In *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), the Supreme Court first decided whether the Government had the power to regulate indecent speech. *Id.* at 729, 98 S.Ct. at 3030. In *Pacifica,* a radio listener complained about the broadcast of George Carlin's "Filthy Words" monologue at 2:00 p.m. on a Tuesday afternoon. *Id.* at 729–30, 98 S.Ct. at 3030. The Carlin monologue was replete with "the words you couldn't say on the public ... airwaves ..., ever", and the listener had tuned in while driving with his young son in New York. *Id.* The FCC issued a declaratory order, holding that it could have subjected the Pacifica Foundation (owner of the radio station) to an administrative sanction. *Id.* at 730, 98 S.Ct. at 3030. In its order the FCC also described the standards that it would use in the future to regulate indecency in the broadcast medium. *Id.* at 731, 98 S.Ct. at 3030–31. The Supreme Court upheld the FCC's decision and confirmed the power of that agency to regulate indecent speech. *Id.* at 750–51, 98 S.Ct. at 3040–41.

The rationale of *Pacifica* rested on three overlapping considerations. First, using as its example the Carlin monologue before it, the Court weighed the value of indecent speech and concluded that such speech "lie[s] at the periphery of First Amendment concerns." *Id.* at 743, 98 S.Ct. at 3037. Although the Court recognized that the FCC had threatened to punish Pacifica based on the content of the Carlin monologue, *id.* at 742, 98 S.Ct. at 3036–37, it found that the punishment would have been permissible because four-letter words "offend for the same reasons that obscenity offends." *Id.* at 746, 98 S.Ct. at 3039 (footnote omitted). The Court then described the place of four-letter words "in the hierarchy of first amendment values":

> Such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that

any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.

*Id.* at 746, 98 S.Ct. at 3039 (citing *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942)).

Second, the Court recognized that "broadcasting ... has received the most limited First Amendment protection." *Id.* at 748, 98 S.Ct. at 3040. The Government may regulate broadcast consistent with the Constitution, even though the same regulation would run afoul of the First Amendment in the print medium. *Id.* (comparing *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) with *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974)). This is so because broadcasting has a "uniquely pervasive presence in the lives of all Americans" and "is uniquely accessible to children, even those too young to read." *Pacifica*, 438 U.S. at 748–49, 98 S.Ct. at 3040.

Third, the Court found the FCC's sanction—an administrative sanction—to be an appropriate means of regulating indecent speech. At the outset of the opinion, the Court disclaimed that its holding was a "consider[ation of] any question relating to the possible application of § 1464 as a criminal statute." *Id.* at 739 n. 13, 98 S.Ct. at 3035. Later in the opinion, the Court "emphasize[d] the narrowness of [its] holding", and explicitly recognized that it had not held that the Carlin monologue would justify a criminal prosecution. *Id.* at 750, 98 S.Ct. at 3040–41. Instead, the Court allowed the FCC to regulate indecent speech with administrative penalties under a "nuisance" rationale—"like a pig in the parlor instead of the barnyard." *Id.* at 750, 98 S.Ct. at 3041 (citation omitted).

Time has not been kind to the *Pacifica* decision. Later cases have eroded its reach, and the Supreme Court has repeatedly instructed against overreading the rationale of its holding.

First, in *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983), the Supreme Court refused to extend *Pacifica* to a law unrelated to broadcasting. In that case, a federal law prohibited the unsolicited mailing of contraceptive advertisements. *Id.* at 61, 103 S.Ct. at 2877. The Government defended the law by claiming an interest in protecting children from the advertisements. The Court rejected this argument as overbroad:

> In [*Pacifica*], this Court did recognize that the Government's interest in protecting the young justified special treatment of an afternoon broadcast heard by adults as well as children. At the same time, the majority "emphasize[d] the narrowness of our holding", explaining that broadcasting is *"uniquely* pervasive" and that it is *"uniquely* accessible to children, even those too young to read." The receipt of mail is far less intrusive and uncontrollable. Our decisions have recognized that the special interest of the Federal Government in regulation of the broadcast media does not readily translate into a justification for regulation of other means of communication.

*Id.* at 74, 103 S.Ct. at 2884 (citations and footnotes omitted) (emphasis in original) *see also id.* at 72, 103 S.Ct. at 2883 ("[T]he 'short, though regular, journey from mail box to trash can ... is an acceptable burden, at least so far as the Constitution is concerned.'") (citation omitted) (alterations in original).

Second, in *Sable Communications v. FCC*, 492 U.S. 115, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989), the Supreme Court again limited *Pacifica*. In that case, the Court considered the validity of a ban on indecent "dial-a-porn" communications. *Id.* at 117–18, 109 S.Ct. at 2832.[17] As in *Bolger*, the Government argued that *Pacifica* justified a complete ban of that form of speech. The Supreme Court disagreed, holding instead that *Pacifica*'s "emphatically narrow" holding arose out of the "unique attributes of broadcasting". *Id.*

---

17. The history of dial-a-porn regulation both before and after *Sable* is tortuous, and involves the intervention of all three branches of government. I will not rehearse that history here, deferring instead to the other courts that have recounted it.

*See, e.g., Sable*, 492 U.S. at 118–23, 109 S.Ct. at 2832–35; *Dial Information Serv.*, 938 F.2d at 1537–40; *Information Providers Coalition*, 928 F.2d at 870–73.

at 127, 109 S.Ct. at 2837. The Court held that the ban was unconstitutional. *Id.* at 131, 109 S.Ct. at 2839.

*Sable* narrowed *Pacifica* in two ways. First, the Court implicitly rejected *Pacifica*'s nuisance rationale for dial-a-porn, holding instead that the Government could only regulate the medium "by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms". *Id.* at 126, 109 S.Ct. at 2836. (citation omitted). Under this strict scrutiny, "[i]t is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends." *Id.; see also Fabulous Assoc. v. Pennsylvania Pub. Util. Comm.*, 896 F.2d 780, 784–85 (3d Cir.1990).

Second, the Court concluded that the law, like a law it had struck down in 1957, "denied adults their free speech rights by allowing them to read only what was acceptable for children". *Sable*, 492 U.S. at 126, 109 S.Ct. at 2837 (citing *Butler v. Michigan*, 352 U.S. 380, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957)). Thus, any regulation of dial-a-porn would have to give adults the opportunity to partake of that medium. *Id.* This conclusion echoes *Bolger. See Bolger*, 463 U.S. at 74, 103 S.Ct. at 2884 ("The level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox.").[18]

Finally, in *Turner Broadcasting System, Inc. v. FCC*, —— U.S. ——, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994), the Supreme Court implicitly limited *Pacifica* once again when it declined to adopt the broadcast rationale for the medium of cable television. The Court concluded that the rules for broadcast were "inapt" for cable because of the "fundamental technological differences between broadcast and cable transmission". *Id.* at ——, 114 S.Ct. at 2457.

The legal significance to this case of *Turner*'s refusal to apply the broadcast rules to cable television cannot be overstated. *Turner*'s holding confirms beyond doubt that the holding in *Pacifica* arose out of the scarcity rationale unique to the underlying technology of broadcasting, and not out of the end product that the viewer watches. That is, *cable* television has no less of a "uniquely pervasive presence" than *broadcast* television, nor is cable television more "uniquely accessible to children" than broadcast. *See Pacifica*, 438 U.S. at 748–49, 98 S.Ct. at 3039–40. From the viewer's perspective, cable and broadcast television are identical: moving pictures with sound from a box in the home. Whether one receives a signal through an antenna or through a dedicated wire, the end result is just television in either case. In declining to extend broadcast's scarcity rationale for cable, the Supreme Court also implicitly limited *Pacifica*, the holding of which flows directly from that rationale.[19]

*Turner* thus confirms that the analysis of a particular medium of mass communication must focus on the underlying technology that brings the information to the user. In broadcast, courts focus on the limited num-

18. *Sable* is arguably not a decision about mass communication. Unlike *Red Lion, Tornillo*, or *Turner*, the Court in *Sable* reached no conclusions about the proper fit between the First Amendment and governmental regulation of the telephone. The case also includes no discussion of the technology of the telephone generally. The plaintiff in that case, a purveyor of dial-a-porn, challenged the statute only with respect to that type of content. *Sable*, 492 U.S. at 117–18, 109 S.Ct. at 2832. Thus, the Court's opinion discussed only the "dial-in services". *Id.* at 128, 109 S.Ct. at 2837–38. Since every telephone call at issue was, by definition, dial-a-*porn*, every telephone call was, by definition, either obscene or indecent. *Id.* at 132, 109 S.Ct. at 2839–40 (Scalia, J., concurring).

Here, however, plaintiffs represent forty-seven different speakers (including educational associa-

tions and consortia) who provide content to the Internet on a broad range of topics. The limited reach of the *Sable* holding renders it inapt to the Internet communications of the plaintiffs in these actions.

19. I note here, too, that we have found as a fact that operation of a computer is not as simple as turning on a television, and that the assaultive nature of television, *see Pacifica*, 438 U.S. at 748–49, 98 S.Ct. at 3039–40, is quite absent in Internet use. *See* Findings 87–89. The use of warnings and headings, for example, will normally shield users from immediate entry into a sexually explicit Web site or newsgroup message. *See* Finding 88. The Government may well be right that sexually explicit content is just a few clicks of a mouse away from the user, but there is an immense legal significance to those few clicks.

ber of band widths and the risk of interference with those frequencies. *See, e.g., Turner,* —— U.S. at —— - ——, 114 S.Ct. at 2456–57. In cable, courts focus on the number of channels, the different kinds of cable operators, and the cost to the consumer. *Id.* at ——, 114 S.Ct. at 2452.

I draw two conclusions from the foregoing analysis. First, from the Supreme Court's many decisions regulating different media differently, I conclude that we cannot simply assume that the Government has the power to regulate protected speech over the Internet, devoting our attention solely to the issue of whether the CDA is a constitutional exercise of that power. Rather, we must also decide the validity of the underlying assumption as well, to wit, whether the Government has the power to regulate protected speech at all. That decision must take into account the underlying technology, and the actual and potential reach, of that medium. Second, I conclude that *Pacifica*'s holding is not persuasive authority here, since plaintiffs and the Government agree that Internet communication is an abundant and growing resource. Nor is *Sable* persuasive authority, since the Supreme Court's holding in that case addressed only one particular type of communication (dial-a-porn), and reached no conclusions about the proper fit between the First Amendment and telephone communications generally. Again, plaintiffs and the Government here agree that the Internet provides content as broad as the imagination.

**3. The Effect of the CDA and the Novel Characteristics of Internet Communication**

Over the course of five days of hearings and many hundreds of pages of declarations, deposition transcripts, and exhibits, we have learned about the special attributes of Internet communication. Our Findings of fact—many of them undisputed—express our understanding of the Internet. These Findings lead to the conclusion that Congress may not regulate indecency on the Internet at all.

Four related characteristics of Internet communication have a transcendent importance to our shared holding that the CDA is unconstitutional on its face. We explain these characteristics in our Findings of fact

above, and I only rehearse them briefly here. First, the Internet presents very low barriers to entry. Second, these barriers to entry are identical for both speakers and listeners. Third, as a result of these low barriers, astoundingly diverse content is available on the Internet. Fourth, the Internet provides significant access to all who wish to speak in the medium, and even creates a relative parity among speakers.

To understand how disruptive the CDA is to Internet communication, it must be remembered that the Internet evolved free of content-based considerations. Before the CDA, it only mattered how, and how quickly, a particular packet of data travelled from one point on the Internet to another. In its earliest incarnation as the ARPANET, the Internet was for many years a private means of access among the military, defense contractors, and defense-related researchers. The developers of the technology focused on creating a medium designed for the rapid transmittal of the information through overlapping and redundant connections, and without direct human involvement. Out of these considerations evolved the common transfer protocols, packet switching, and the other technology in which today's Internet users flourish. The content of the data was, before the CDA, an irrelevant consideration.

It is fair, then, to conclude that the benefits of the Internet to private speakers arose out of the serendipitous development of its underlying technology. As more networks joined the "network of networks" that is the Internet, private speakers have begun to take advantage of the medium. This should not be surprising, since participation in the medium requires only that networks (and the individual users associated with them) agree to use the common data transfer protocols and other medium-specific technology. Participation does not require, and has never required, approval of a user's or network's content.

After the CDA, however, the content of a user's speech will determine the extent of participation in the new medium. If a speaker's content is even arguably indecent in some communities, he must assess, *inter alia,* the risk of prosecution and the cost of

compliance with the CDA. Because the creation and posting of a Web site allows users anywhere in the country to see that site, many speakers will no doubt censor their speech so that it is palatable in every community. Other speakers will decline to enter the medium at all. Unlike other media, there is no technologically feasible way for an Internet speaker to limit the geographical scope of his speech (even if he wanted to), or to "implement[ ] a system for screening the locale of incoming" requests. *Sable* 492 U.S. at 125, 109 S.Ct. at 2836.

The CDA will, without doubt, undermine the substantive, speech-enhancing benefits that have flowed from the Internet. Barriers to entry to those speakers affected by the Act would skyrocket, especially for non-commercial and not-for-profit information providers. Such costs include those attributable to age or credit card verification (if possible), tagging (if tagging is even a defense under the Act[20]), and monitoring or review of one's content.

The diversity of the content will necessarily diminish as a result. The economic costs associated with compliance with the Act will drive from the Internet speakers whose content falls within the zone of possible prosecution. Many Web sites, newsgroups, and chat rooms will shut down, since users cannot discern the age of other participants. In this respect, the Internet would ultimately come to mirror broadcasting and print, with messages tailored to a mainstream society from speakers who could be sure that their message was likely decent in every community in the country.

The CDA will also skew the relative parity among speakers that currently exists on the Internet. Commercial entities who can afford the costs of verification, or who would charge a user to enter their sites, or whose content has mass appeal, will remain unaffected by the Act. Other users, such as Critical Path or Stop Prisoner Rape, or even the ACLU, whose Web sites before the CDA were as equally accessible as the most popular Web sites, will be profoundly affected by the Act. This change would result in an Internet that mirrors broadcasting and print,

---

**20.** In a May 3, 1996 letter to a three-judge court in the Southern District of New York, John C. Keeney, Acting Assistant Attorney General in the Criminal Division of the Department of Justice, has advised that tagging would be "substantial evidence" in support of a § 223(e)(5)(A) defense:

> Under present technology, non-commercial content providers can take steps to list their site[s] in URL registries of covered sites, register their site[s] with the marketplace of browsers and blocking software (including listing an IP address), place their material in a directory blocked by screening software, or take other similarly effective affirmative steps to make their site[s] known to the world to allow the site[s] to be blocked. Under present technology, it is the position of the Department of Justice that, absent extraordinary circumstances, such efforts would constitute substantial evidence that a content provider had taken good faith, reasonable, effective, and appropriate actions under the circumstances to restrict or prevent access by minors to the covered material. The same would be true for tagging by content providers coupled with evidence that the tag would be screened by the marketplace of browsers and blocking software.

Letter of May 3, 1996 from Acting Assistant Attorney General John C. Keeney to Hons. Denise L. Cote, Leonard B. Sand, and Jose A. Cabranes, attached to Defendants' Motion for Leave to File Supplemental Statement. On May 8, 1996, the Government moved to file the Kenney letter in this action, and we granted the motion as unopposed the next day.

The letter certainly raises more questions than it answers. I wonder, for example, whether it is consistent with the plain language of the Act simply for content providers to "make their site[s] known to the world" and thereby "to allow [them] to be blocked", even though this form of notice alone would not reduce the availability of indecent content. *Cf.* Senate Report at 178, 1996 U.S.C.C.A.N. at 201 (noting that § 223(d) "applies to content providers who post indecent material for online display without taking precautions that shield that material from minors"). It is also an unanswered question whether the Keeney letter would eliminate any of the CDA's chill, since the Government acknowledged that the letter would not prohibit a United States Attorney from taking a contrary position in a particular prosecution. *See* Defendants' May 9, 1996 Response to the May 8, 1996 Order of Court. The letter also fails to mention how users who participate in chat rooms, newsgroups, listservs, and e-mail might take advantage of § 223(e)(5)(A). Finally, it is undisputed that neither PICS nor the hypothetical "–L18" tag are available to speakers using the World Wide Web today, whom the Government has explicitly reserved its right to prosecute should the CDA ultimately be found constitutional. *See* Stipulation and Order of February 26, 1996, *quoted supra.*

where economic power has become relatively coterminous with influence.

Perversely, commercial pornographers would remain relatively unaffected by the Act, since we learned that most of them already use credit card or adult verification anyway. Commercial pornographers normally provide a few free pictures to entice a user into proceeding further into the Web site. To proceed beyond these teasers, users must provide a credit card number or adult verification number. The CDA will force these businesses to remove the teasers (or cover the most salacious content with cgi scripts), but the core, commercial product of these businesses will remain in place.

The CDA's wholesale disruption on the Internet will necessarily affect adult participation in the medium. As some speakers leave or refuse to enter the medium, and others bowdlerize their speech or erect the barriers that the Act envisions, and still others remove bulletin boards, Web sites, and newsgroups, adults will face a shrinking ability to participate in the medium. Since much of the communication on the Internet is participatory, i.e., is a form of dialogue, a decrease in the number of speakers, speech fora, and permissible topics will diminish the worldwide dialogue that is the strength and signal achievement of the medium.

It is no answer to say that the defenses and exclusions of § 223(e) mitigate the disruptive forces of the Act. We have already found as facts that the defenses either are not available to plaintiffs here or would impose excessive costs on them. These defenses are also unavailable to participants in specific forms of Internet communication.

I am equally dubious that the exclusions of § 223(e) would provide significant relief from the Act. The "common carrier" exclusion of § 223(e)(1), for example, would not insulate America Online from liability for the content it provides to its subscribers. It is also a tricky question whether an America Online chat room devoted to, say, women's reproductive health, is or is not speech of the service itself, since America Online, at least to some extent, "creat[es] the content of the communication" simply by making the room available and assigning it a topic. Even if

America Online has no liability under this example, the service might legitimately choose not to provide fora that led to the prosecution of its subscribers. Similarly, it is unclear whether many caching servers are devoted "solely" to the task of "intermediate storage". The "vicarious liability" exclusion of § 223(e)(4) would not, for example, insulate either a college professor or her employer from liability for posting an indecent online reading assignment for her freshman sociology class.

We must of course give appropriate deference to the legislative judgments of Congress. See Sable, 492 U.S. at 129, 109 S.Ct. at 2838; Turner, — U.S. at —– – —, 114 S.Ct. at 2472–73 (Blackmun, J., concurring). After hearing the parties' testimony and reviewing the exhibits, declarations, and transcripts, we simply cannot in my view defer to Congress's judgment that the CDA will have only a minimal impact on the technology of the Internet, or on adult participation in the medium. As in Sable, "[d]eference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake." Sable, 492 U.S. at 129, 109 S.Ct. at 2838 (citation omitted). Indeed, the Government has not revealed Congress's "extensive record" in addressing this issue, Turner, — U.S. at —, 114 S.Ct. at 2472 (Blackmun, J., concurring), or otherwise convinced me that the record here is somehow factually deficient to the record before Congress when it passed the Act.

### 4. Diversity and Access on the Internet

Nearly eighty years ago, Justice Holmes, in dissent, wrote of the ultimate constitutional importance of the "free trade in ideas":

[W]hen men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market. . . .

*Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting).

For nearly as long, critics have attacked this much-maligned "marketplace" theory of First Amendment jurisprudence as inconsistent with economic and practical reality. Most marketplaces of mass speech, they charge, are dominated by a few wealthy voices. *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 248–50, 94 S.Ct. 2831, 2834–36, 41 L.Ed.2d 730 (1974). These voices dominate—and to an extent, create— the national debate. *Id.* Individual citizens' participation is, for the most part, passive. *Id.* at 251, 94 S.Ct. at 2836. Because most people lack the money and time to buy a broadcast station or create a newspaper, they are limited to the role of listeners, *i.e.,* as watchers of television or subscribers to newspapers. *Id.*

Economic realities limit the number of speakers even further. Newspapers competing with each other and with (free) broadcast tend toward extinction, as fixed costs drive competitors either to consolidate or leave the marketplace. *Id.* at 249–50, 94 S.Ct. at 2835–36. As a result, people receive information from relatively few sources:

> The elimination of competing newspapers in most of our large cities, and the concentration of control of media that results from the only newspaper's being owned by the same interests which own a television station and a radio station, are important components of this trend toward concentration of control of outlets to inform the public.
>
> The result of these vast changes has been to place in a few hands the power to inform the American people and shape public opinion.

*Id.* at 249–50, 94 S.Ct. at 2836.

The Supreme Court has also recognized that the advent of cable television has not offered significant relief from this problem. Although the number of cable channels is exponentially greater than broadcast, *Turner,* —— U.S. at ——, 114 S.Ct. at 2452, cable imposes relatively high entry costs, *id.* at ——–——, 114 S.Ct. at 2451–52 (noting that the creation of a cable system requires "[t]he construction of [a] physical infrastructure").

Nevertheless, the Supreme Court has resisted governmental efforts to alleviate these market dysfunctions. In *Tornillo,* the Supreme Court held that market failure simply could not justify the regulation of print, 418 U.S. at 258, 94 S.Ct. at 2839–40, regardless of the validity of the criticisms of that medium, *id.* at 251, 94 S.Ct. at 2836. *Tornillo* invalidated a state "right-of-reply" statute, which required a newspaper critical of a political candidate to give that candidate equal time to reply to the charges. *Id.* at 244, 94 S.Ct. at 2832–33. The Court held that the statute would be invalid even if it imposed no cost on a newspaper, because of the statute's intrusion into editorial discretion:

> A newspaper is more than a passive receptacle or conduit for news, comment, and advertising. The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment.

*Id.* at 258, 94 S.Ct. at 2840.

Similarly, in *Turner,* the Supreme Court rejected the Government's argument that market dysfunction justified deferential review of speech regulations for cable television. Even recognizing that the cable market "suffers certain structural impediments", *Turner,* —— U.S. at ——, 114 S.Ct. at 2457, the Court could not accept the Government's conclusion that this dysfunction justified broadcast-type standards of review, since "the mere assertion of dysfunction or failure in a speech market, without more, is not sufficient to shield a speech regulation from the First Amendment standards applicable to nonbroadcast media." *Id.* at ——, 114 S.Ct. at 2458. "[L]aws that single out the press, or certain elements thereof, for special treatment 'pose a particular danger of abuse by the State,' and so are always subject to at least some degree of heightened First Amendment scrutiny." *Id.* (citation omit-

ted).[21] The Court then eloquently reiterated that government-imposed, content-based speech regulations are generally inconsistent with "[o]ur political system and cultural life":

At the heart of the First Amendment lies the principle that each person should decide for him or herself the ideas and beliefs deserving of expression, consideration, and adherence. Our political system and cultural life rest upon this ideal. Government action that stifles speech on account of its message, or that requires the utterance of a particular message favored by the Government, contravenes this essential right. Laws of this sort pose the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion. These restrictions "rais[e] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace."

*Id.* (citation omitted).

Both *Tornillo* and *Turner* recognize, in essence, that the cure for market dysfunction (government-imposed, content-based speech restrictions) will almost always be worse than the disease. Here, however, I am hard-pressed even to identify the disease. It is no exaggeration to conclude that the Internet has achieved, and continues to achieve, the most participatory marketplace of mass speech that this country—and indeed the world—has yet seen. The plaintiffs in these actions correctly describe the "democratizing" effects of Internet communication: individual citizens of limited means can speak to a worldwide audience on issues of concern to them. Federalists and Anti–Federalists may debate the structure of their government nightly, but these debates occur in newsgroups or chat rooms rather than in pamphlets. Modern-day Luthers still post their theses, but to electronic bulletin boards rather than the door of the Wittenberg Schlosskirche. More mundane (but from a constitutional perspective, equally important) dialogue occurs between aspiring artists, or French cooks, or dog lovers, or fly fishermen.

Indeed, the Government's asserted "failure" of the Internet rests on the implicit premise that *too much* speech occurs in that medium, and that speech there is *too available* to the participants. This is *exactly* the benefit of Internet communication, however. The Government, therefore, implicitly asks this court to limit both the amount of speech on the Internet and the availability of that speech. This argument is profoundly repugnant to First Amendment principles.

My examination of the special characteristics of Internet communication, and review of the Supreme Court's medium-specific First Amendment jurisprudence, lead me to conclude that the Internet deserves the broadest possible protection from government-imposed, content-based regulation. If "the First Amendment erects a virtually insurmountable barrier between government and the print media", *Tornillo*, 418 U.S. at 259, 94 S.Ct. at 2840 (White, J., concurring), even though the print medium *fails* to achieve the hoped-for diversity in the marketplace of ideas, then that "insurmountable barrier" must also exist for a medium that *succeeds* in achieving that diversity. If our Constitution "prefer[s] 'the power of reason as applied through public discussion'", *id.* (citation omitted), "[r]egardless of how beneficent-sounding the purposes of controlling the press might be", *id.*, even though "occasionally debate on vital matters will not be comprehensive and . . . all viewpoints may not be expressed", *id.* at 260, 94 S.Ct. at 2841, a medium that *does* capture comprehensive debate and *does* allow for the expression of all viewpoints should receive at least the same protection from intrusion.

Finally, if the goal of our First Amendment jurisprudence is the "individual dignity and choice" that arises from "putting the decision as to what views shall be voiced largely into the hands of each of us", *Leathers v. Medlock*, 499 U.S. 439, 448–49, 111

---

21. *Turner* examined certain "must-carry" provisions under an intermediate scrutiny, since those laws imposed incidental burdens on speech but did not directly regulate content. *Turner,* ——

U.S. at ——, 114 S.Ct. at 2469. The Court remanded the case to the district court without passing on the constitutionality of the must-carry provisions. *Id.* at ——, 114 S.Ct. at 2472.

S.Ct. 1438, 1444, 113 L.Ed.2d 494 (1991) (citing *Cohen v. California,* 403 U.S. 15, 24, 91 S.Ct. 1780, 1787–88, 29 L.Ed.2d 284 (1971)), then we should be especially vigilant in preventing content-based regulation of a medium that every minute allows individual citizens actually to make those decisions. Any content-based regulation of the Internet, no matter how benign the purpose, could burn the global village to roast the pig. *Cf. Butler,* 352 U.S. at 383, 77 S.Ct. at 525–26.

### 5. Protection of Children from Pornography

I accept without reservation that the Government has a compelling interest in protecting children from pornography. The proposition finds one of its clearest expressions in Mill, who recognized that his exposition regarding liberty itself "is meant to apply only to human beings in the maturity of their faculties":

> We are not speaking of children or of young persons below the age which the law may fix as that of manhood or womanhood. Those who are still in a state to require being taken care of by others must be protected against their own actions as well as against external injury.

John Stuart Mill, *On Liberty* 69 (Gertrude Himmelfarb ed., Penguin Books 1982) (1859), *cited in* Harry Kalven Jr., *A Worthy Tradition* 54 (Jamie Kalven ed.1988).

This rationale, however, is as dangerous as it is compelling. Laws regulating speech for the protection of children have no limiting principle, and a well-intentioned law restricting protected speech on the basis of its content is, nevertheless, state-sponsored censorship. Regulations that "drive certain ideas or viewpoints from the marketplace" for children's benefit, *Simon & Schuster,* 502 U.S. at 116, 112 S.Ct. at 508, risk destroying the very "political system and cultural life", *Turner,* —— U.S. at ——, 114 S.Ct. at 2458, that they will inherit when they come of age.

I therefore have no doubt that a Newspaper Decency Act, passed because Congress discovered that young girls had read a front page article in the *New York Times* on female genital mutilation in Africa, would be unconstitutional. *Tornillo,* 418 U.S. at 258,

94 S.Ct. at 2839–40. Nor would a Novel Decency Act, adopted after legislators had seen too many pot-boilers in convenience store book racks, pass constitutional muster. *Butler,* 352 U.S. at 383, 77 S.Ct. at 525–26. There is no question that a Village Green Decency Act, the fruit of a Senator's overhearing of a ribald conversation between two adolescent boys on a park bench, would be unconstitutional. *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983). A Postal Decency Act, passed because of constituent complaints about unsolicited lingerie catalogues, would also be unconstitutional. *Bolger,* 463 U.S. at 73, 103 S.Ct. at 2883–84. In these forms of communication, regulations on the basis of decency simply would not survive First Amendment scrutiny.

The Internet is a far more speech-enhancing medium than print, the village green, or the mails. Because it would necessarily affect the Internet itself, the CDA would necessarily reduce the speech available for adults on the medium. This is a constitutionally intolerable result.

Some of the dialogue on the Internet surely tests the limits of conventional discourse. Speech on the Internet can be unfiltered, unpolished, and unconventional, even emotionally charged, sexually explicit, and vulgar—in a word, "indecent" in many communities. But we should expect such speech to occur in a medium in which citizens from all walks of life have a voice. We should also protect the autonomy that such a medium confers to ordinary people as well as media magnates.

Moreover, the CDA will almost certainly fail to accomplish the Government's interest in shielding children from pornography on the Internet. Nearly half of Internet communications originate outside the United States, and some percentage of that figure represents pornography. Pornography from, say, Amsterdam will be no less appealing to a child on the Internet than pornography from New York City, and residents of Amsterdam

have little incentive to comply with the CDA.[22]

My analysis does not deprive the Government of all means of protecting children from the dangers of Internet communication. The Government can continue to protect children from pornography on the Internet through vigorous enforcement of existing laws criminalizing obscenity and child pornography. *See United States v. Thomas,* 74 F.3d 701, 704–05 (6th Cir.1995). As we learned at the hearing, there is also a compelling need for public education about the benefits and dangers of this new medium, and the Government can fill that role as well. In my view, our action today should only mean that the Government's permissible supervision of Internet content stops at the traditional line of unprotected speech.

Parents, too, have options available to them. As we learned at the hearing, parents can install blocking software on their home computers, or they can subscribe to commercial online services that provide parental controls. It is quite clear that powerful market forces are at work to expand parental options to deal with these legitimate concerns. More fundamentally, parents can supervise their children's use of the Internet or deny their children the opportunity to participate in the medium until they reach an appropriate age. *See Fabulous,* 896 F.2d at 788–89 (noting that "our society has traditionally placed" these decisions "on the shoulders of the parent").

## E. Conclusion

Cutting through the acronyms and *argot* that littered the hearing testimony, the Internet may fairly be regarded as a never-ending worldwide conversation. The Government may not, through the CDA, interrupt that conversation. As the most participatory form of mass speech yet developed, the Internet deserves the highest protection from governmental intrusion.

True it is that many find some of the speech on the Internet to be offensive, and amid the din of cyberspace many hear discordant voices that they regard as indecent. The absence of governmental regulation of Internet content has unquestionably produced a kind of chaos, but as one of plaintiffs' experts put it with such resonance at the hearing:

> What achieved success was the very chaos that the Internet is. The strength of the Internet is that chaos.[23]

Just as the strength of the Internet is chaos, so the strength of our liberty depends upon the chaos and cacophony of the unfettered speech the First Amendment protects.

For these reasons, I without hesitation hold that the CDA is unconstitutional on its face.

### ORDER

AND NOW, this 11th day of June, 1996, upon consideration of plaintiffs' motions for preliminary injunction, and the memoranda of the parties and *amici curiae* in support and opposition thereto, and after hearing, and upon the findings of fact and conclusions of law set forth in the accompanying Adjudication, it is hereby ORDERED that:

1. The motions are GRANTED;

2. Defendant Attorney General Janet Reno, and all acting under her direction and control, are PRELIMINARILY ENJOINED from enforcing, prosecuting, investigating or reviewing any matter premised upon:

(a) Sections 223(a)(1)(B) and 223(a)(2) of the Communications Decency Act of 1996 ("the CDA"), Pub.L. No. 104–104, § 502, 110 Stat. 133, 133–36, to the extent such enforcement, prosecution, investigation, or review are based upon allegations other than obscenity or child pornography; and

(b) Sections 223(d)(1) and 223(d)(2) of the CDA;

---

**22.** Arguably, a valid CDA would create an incentive for overseas pornographers *not* to label their speech. If we upheld the CDA, foreign pornographers could reap the benefit of unfettered access to American audiences. A valid CDA might also encourage American pornographers to relocate in foreign countries or at least use anonymous remailers from foreign servers.

**23.** Testimony of March 22, 1996, at 167.

3. Pursuant to Fed.R.Civ.P. 65(c), plaintiffs need not post a bond for this injunction, *see Temple Univ. v. White*, 941 F.2d 201, 220 (3d Cir.1991), *cert. denied sub nom. Snider v. Temple Univ.*, 502 U.S. 1032, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992); and

4. The parties shall advise the Court, in writing, as to their views regarding the need for further proceedings on the later of (a) thirty-one days from the date of this Order, or (b) ten days after final appellate review of this Order.